8644

STATE *EX REL.* RAY v. BLEASE, GOVERNOR.

1. JURISDICTION.—THE SINKING FUND COMMISSION is not subject to the control of the Court in matters within its discretion.

2. CONSTITUTIONAL LAW.—The act of 1912, 27 Stat. 738, does not violate section 17 of article III of the Constitution in that the provision in the body of the act is that bonds and stocks may be issued to retire those in circulation while the title expresses the subject of providing for the exercise of the State's option in calling in certain bonds and stocks, as the provision in the body is germane to the subject expressed in the title.

3. TWO OFFICES.—Membership in the sinking fund commission is not an office. The law creating the commission only devolves on certain officers specific duties.

4. CONSTITUTIONAL LAW—STATUTES.—Where there are two possible constructions of an act, one of them making its provisions consistent and the other inconsistent, the former should be adopted. Applying this rule to the act of 1912 the sinking fund commission under it has no authority to redeem Green Consols. Also if the act were so construed it would violate article III, section 17, of the Constitution.

5. IBID.—IBID.—Under the act of 1912, 27 Stat. 738, the commission has authority to refund Redemption Brown Consols. issued under the act of 1893, as that act was only amendatory to the act of 1892 on the same subject.

6. IBID.—BOND DEBT OF STATE.—The following principles apply to the state in refunding its outstanding bonded debt:

(1) The refunding of a valid existing debt does not increase the debt of the State, and needs not the sanction of the qualified electors which is required by section 11 of article X of the Constitution before the public debt can be increased.

(2) The liability of the State upon negotiable paper, issued by competent authority, is the same as that which attaches to private individuals under like circumstances.

(3) Holders of such paper in the absence of allegation to the contrary are presumed to be innocent purchasers for value before maturity and without notice of any objection to which it may be liable.

(4) When authority to issue such paper exists neither irregularities nor frauds on the part of the officers or agents of the State who are entrusted with the exercise of such authority will affect it in the hands of such holders.

(5) The State is estopped to deny recitals on the face of such paper in the hands of such holders.

7. IBID.—IBID.—VALIDATION.—The title of the joint resolution approved March 22, 1878, is sufficiently comprehensive to embrace in the body of the resolution the validation of the issuance of Green Consols by former officers of the State after their terms of office had expired. The State has the authority to authorize private individuals to issue bonds and to validate any irregularities in their issuance.

8. IBID.—IBID.—The title of the act of 1878 is broad enough to include the refunding of obligations of the State issued after January 1, 1866.

9. LIMITATION OF ACTIONS.—The act of 1896 limiting the time within which coupon bonds may be consolidated or refunded does not destroy the validity of such obligations, but only prevents the State Treasurer from refunding them after that time and the legislature by thereafter providing for refunding such obligations does not thereby increase the bonded debt of the State.

10. BOND DEBT OF STATE.—"Date of issue" as used in the act of 1892 means the date which stocks and bonds bear, and does not refer to the date on which they were actually issued.

11. IBID.—Under the provisions of the act of 1892 the sinking fund commission should now (at the expiration of 20 years from the date of the bonds then issued) cancel the bonds and stocks bought by it.

Petition by W. W. Ray *ex rel.* the State for injunction against the Sinking Fund Commission.

*Messrs. Weston & Aycock,* for petitioner, cite: *Resolution of Sinking Fund Commission passed by less than a quorum is not valid:* Sedg. Con. L. 387; 11 S. C. 343; 28

S. C. 521; 52 S. C. 60; 86 S. W. 319; 21 Barb. 500; 22 Barb. 137, 400; 46 N. Y. 375; 49 Pac. 89; 31 Miss. 525; 9 Ark. 300; Mech. Pub. Off., secs. 572-3; 52 N. Y. 478; 74 S. E. 506; Harp. 139; 144 U. S. 1; 4 Tenn. Rep. 810; 6 *Ibid.* 268; 4 East. 17; 1 B. & C. 492, 609; 9 B. & C. 851; Cushing L. & P. of Leg. Ass., sec. 261; 1 Pearson 118; 12 Fla. 653; 5 Davis Abridg. 150; 4 Abb. N. Cas. 51; 4 So. 763; 59 Pac. 563. *Chairman of the Ways and Means Committee of the House is not a member after election of his successor:* 28 Cal. 44; 122 N. W. 462; 147 N. Y. 426; 46 Fed. 728; 24 Am. St. 276. *Act of 1912 is unconstitutional because subject is not expressed in the title:* 75 S. E. 392. *Bonds executed and issued after terms of officers who were authorized to issue them are invalid:* 131 U. S. 162; Dillon, sec. 888; 138 Fed. 313. *Where bonds of a single series are issued beyond a constitutional limit, those first delivered within the limit are valid:* 117 U. S. 657; 22 Am. R. 215; Dillon, section 203. *Consols stolen are not binding obligations of the State:* 78 S. C. 269. *Meaning of "date of issue:"* 66 S. E. 681.

*Mr. J. Fraser Lyon,* for certain respondents, cites: *Majority of existing members of commission may act for body:* 33 Mich. 321; 68 N. W. 802; 122 Wis. 526; 3 Strob. 486; 28 S. C. 521; Dillon, secs. 502, 520; 55 N. W. 547; 95 U. S. 360; 86 Ga. 132; 4 At. 116; 1 Pac. 356; 1 Wis. 597; 1 McC. 52; 36 L. R. A. 746; 23 Ency. 368; 26 Conn. 192; 37 S. W. 393; 23 Barb. 176; 21 Pick. 75; 85 S. C. 156; 71 S. E. 506; Harp. 139; 17 Abb. Pr. R. 201; 56 N. E. 14; 71 Pac. 365; 59 At. 961. *Chairman of Ways and Means Committee could act until his successor qualified:* 131 N. W. 861; Dillon, sec. 412; 4 At. 282. *He was defacto officer:* 35 S. C. 192; 7 Rich. L. 21; 27 S. C. 436; Dillon 518; Constantinean on De Facto, secs. 311-12; 147 N. Y. 426; 86 S. C. 503. *Subject of act of 1912 is within title:* 74 S. C. 448. *Two office doctrine does not apply to members of the*

*commission:* 52 S. W. 480; 9 S. W. 120; 81 N. W. 377; 6
W. Va. 562; 47 S. C. 75; 52 S. C. 520.   *The act of 1912
provides for refunding Green Consols:* Suth. Stat. Con.,
secs. 383, 349; 48 S. C. 149.   *And consols stolen:* 78 S. C.
269.   *Legislature may validate irregular issue of bonds:*
4 S. C. 430; 12 S. C. 200; 10 Rich. L. 491; 75 S. E. 503.
*Mere irregularity in issue of bonds do not affect their valid-
ity:* 12 S. C. 200; 39 S. C. 288; 78 S. C. 269; Dillon, sec.
903; Machen Law of Corporations, sec. 1743; 41 N. E. 7;
173 Mass. 275.   *Meaning of "date of issue:"* 25 Pac. 1014.

September 8, 1913.   The opinion of the Court was deliv-
ered by

MR. JUSTICE HYDRICK.   At the session of 1912, the legis-
lature passed an act entitled, "An act to provide for the
exercise by the State of its option to call in and pay the
whole or any part of the Brown Bonds and Stocks, issued
under an act entitled 'An act to provide for the redemption
of that portion of the State debt known as the Brown Con-
sol Bonds and Stocks, by the issue of other bonds and stocks,'
approved December 22, A. D. 1892."   27 Stat. 738.   The
act provides that the Sinking Fund Commission, which is
composed of the Governor, the State Treasurer, the Comp-
troller General, the Attorney General, the chairman of the
Committee on Finance of the Senate and the chairman of
the Committee on Ways and Means of the House of Rep-
resentatives, shall have authority to exercise the option
reserved to the State in the refunding act of 1892 (24 Stat.
24) to call in and pay, at the expiration of twenty years
from the date of issue thereof, the whole or any part of the
bonds and stocks issued thereunder, dated January 1, 1893,
and known as Redemption Brown Consols; and, for that
purpose, that the commission shall be authorized to issue and
sell 4% bonds and stocks, not exceeding the aggregate out-
standing amount of the bonds and stocks that have been or

may be issued under said act of 1892, and certain previous refunding acts which are specifically mentioned.

During the year 1912, the commission passed several resolutions and took some steps preliminary to carrying out the provisions of the act. Hon. W. L. Mauldin, who was chairman of the Committee on Finance of the Senate, died before either of the meetings of the commission herein mentioned was held, and thereby a vacancy in the commission was created. On October 30, 1912, the commission passed a resolution that its clerk ascertain what amount of the sinking fund would be available on January 2, 1913, for retiring the Brown Consols, and that, when the amount was ascertained, "the necessary steps be taken for calling in the bonds to collect the amount thereof to be paid off and retired." That resolution was adopted at a meeting of the commission attended by four of its members, and its validity has not been questioned. On December 2, 1912, in pursuance of that resolution, the State Treasurer, who is the secretary and treasurer of the commission, published over his signature, as State Treasurer and treasurer of the commission, in a financial paper in New York and in two daily papers in this State, a notice to the holders of Redemption Brown Bonds, issued under the act of 1892, and numbered from 3781 to 4319, both included, to present the same to him, on January 1, 1913, for payment, and that interest accruing thereon after said date would not be paid.

On December 23, 1912, pursuant to a call of the chairman of the commission, due notice of which was given to each member thereof, the Attorney General, the Comptroller General, the State Treasurer, and Hon. L. J. Browning, who had been, and claimed that he was then, chairman of the Committee on Ways and Means of the House of Representatives, met together as the Sinking Fund Commission, and, by unanimous vote, passed several resolutions relative to the refunding of the State debt, under the act of 1912, the substance of which was as follows: 1. Ratifying the publica-

tion of the notice by the treasurer above mentioned. 2. Authorizing the Comptroller General to receive proposals, pursuant to published advertisement or otherwise, for the purpose of the issue of bonds and stocks which the commission was authorized by the act of 1912 to issue. 3. That the Comptroller General report to the commission the proposals received, and that the commission sell the bonds and stocks at the best price obtainable, not less than par flat. 4. That after the completion of said sale, the treasurer call all Redemption Brown Bonds (not already called) for redemption on July 1, 1913, but if said sale should not have been completed by that date, said call should abide the further order of the commission. 5. That the new issue of bonds and stocks should be dated and bear interest from January 1, 1913, specifying the rate of interest, times and places of payment thereof, and the date of maturity of the bonds and stocks, and the privilege of redemption, according to the terms of the act.

The validity of these resolutions is questioned by the petitioner and by some of the respondents, on the ground that, when they were adopted, Mr. Browning's term of office as a member of the House of Representatives had expired, and he was not, therefore, a member of the commission, and, without him, there were only three members present, and, as four members were necessary to constitute a quorum, no business could have been lawfully transacted at said meeting. Section 10 of article II of the Constitution provides that the terms of office of representatives chosen at a general election shall begin the Monday following such election. Mr. Browning's successor was elected at the general election held on November 5, 1912; therefore, it is contended that he was not a lawful member of the commission on December 23, 1912, the date on which the resolutions in question were passed.

On January 6, 1913, this action for injunction was commenced against the former members of the commission to

test the constitutionality of the act of 1912, and the authority of the commission thereunder to pay or refund certain outstanding bonds and stocks, which are particularly mentioned in the petition, and the validity of the resolution of December 23, 1912, in order that all questions as to the validity of the bonds and stocks which may be issued by the commission may be finally settled and determined.

After the General Assembly had convened, pursuant to the Constitution, and after the State officers who had been elected at the general election, on November 5, 1912, had been inaugurated and qualified, and a chairman of the Committee on Finance of the Senate and a chairman of the Committee on Ways and Means of the House of Representatives had been appointed, an order was passed making these new officials parties respondent herein.

After returns had been filed on behalf of all the respondents, the case was referred to Halcott P. Green, Esq., as special referee, to take and report the testimony, together with his findings thereupon.

The referee finds that the allegations or suggestions contained in the return of his Excellency, the Governor, are unsustained, in so far as it is therein alleged or suggested that there was any irregularity or fraud in connection with the refunding of bonds under the act of 1892, or any unfairness, impropriety, illegality or collusion in connection with any understanding or agreement on the part of the former members of the commission, or any of them, with any person, firm or corporation relative to the purchase or sale of the bonds and stocks to be issued under the act of 1912, or with reference to the bringing of this action. As the matters referred to do not affect the validity of the bonds and stocks to be issued, and as no exception has been taken to the findings of the referee, we deem it unnecessary to prolong this opinion by a more detailed statement or consideration of them.

It appears that the action of the State Treasurer and treasurer of the Sinking Fund Commission in advertising the call for the Redemption Brown Bonds hereinbefore mentioned, to be presented to him, on January 1, 1913, for payment, was based upon and authorized by the resolution of the commission passed at its meeting on October 30, 1912, at which there was a quorum of members whose title to office at that time is unquestioned, and that the resolution of December 23, 1912, so far as that call is concerned, was only an attempt to ratify what he had done. As his action was based upon unquestioned and unquestionable authority, it needed no ratification, which is necessary only when it is sought to validate an act done without authority.

As to the other resolutions of that date, the substance of which has been hereinbefore stated, it need only be said that it appears from their nature that they involve matters of detail which are either fixed by the terms of the act, or such as are within the discretion and judgment of the commission in carrying out the provisions of the act, and are, therefore, still subject to its orders; but as to matters within their discretion, the commission is not subject to the control of the Court. Furthermore, it appears that the commission, as now constituted, refused to revoke these resolutions, and thereby impliedly ratified them. It follows, therefore, that it is unnecessary to decide whether the resolutions passed at the meeting of December 23, 1912, are valid or not; hence, any decision or discussion of the questions involved in that issue would be mere *obiter dictum.*

The validity of the act is questioned under the allegation that it violated section 17 of article III of the Constitution, which provides that every act shall relate to but one subject, which shall be expressed in its title. The specific objection is that the body of the act provides for the issuance of the bonds and stocks, while the title expresses only the subject of providing for the exercise of the State's option to call in and pay certain bonds and stocks.

It is argued that the subject of calling in and paying certain bonds and stocks is not broad enough to cover the issuance of refunding bonds and stocks. But the title is broader than the argument assumes. It expresses the subject of making provision for the exercise of the State's option to call in and pay certain bonds and stocks, and whatever the legislature deemed necessary or proper to make provision to accomplish that purpose is germane to the subject expressed in the title. The issuance of bonds and stocks is the usual method of accomplishing such a purpose, and in this respect the act does not violate the Constitution. *State* v. *O'Day*, 74 S. C. 448, 54 S. E. 607, and cases cited.

It is next alleged that the act violates section 2 of article II of the Constitution, which provides that no person shall hold two offices of honor or profit at the same time. The specific point is that the Sinking Fund Commission is illegally constituted in that it is composed of public officers. The answer to this objection is that membership in the commission is not an office. It merely involves the discharge of duties imposed by law upon the various officers who compose the commission,—duties which are, therefore, merely incidental to their respective offices. *State* v. *Porterfield*, 47 S. C. 75, 25 S. E. 39; *State* v. *Green*, 52 S. C. 520, 30 S. E. 683.

Without stating in detail the legislation under which the obligations of the State have been funded, consolidated and refunded from time to time, it will be sufficient, for the purpose of making clear the objections which we shall next consider, to say that, since the War Between the States, there have been three principal issues of bonds and stocks. The first are called Green Consols. These were issued under the act of 1873 (15 Stat. 518) and subsequent acts amending and extending its provisions. After the greater part of the State debt had been refunded under that act, it was discovered that many of the Green Consols had been issued to redeem bonds and stocks which had been

issued without authority of law, and were, therefore, void. After investigation into the validity of the entire debt of the State, the legislature, in various acts from 1878 to 1880, authorized the issuance of bonds and stocks to take the place of Green Consols found to be valid, and for the refunding of the remaining outstanding valid debt of the State. These bonds were to be of the same kind as Green Consols in every respect material to the present inquiry, except their color. They were colored brown, and are commonly known as Brown Consols. All Green Consols and Brown Consols matured July 1, 1893. In 1892, the legislature passed an act entitled, "An act to provide for the redemption of that part of the State debt known as the Brown Consol Bonds and Stocks by issue of other bonds and stocks." (21 Stat. 24.) The bonds and stock issued under this act are called Redemption Brown Consols. It will be seen from the title of the act, above quoted, that it contemplated the redemption of only the Brown Consols. But, at the date of its passage, there were still outstanding some Green Consols and some other obligations of the State which had not been refunded either in Green Consols or Brown Consols, which were, however, still fundable in Brown Consols; hence, the act authorized an issue of new bonds and stocks sufficient in amount to redeem all the bonds and stocks of the State which had been or might be issued under the act of 1873, and all subsequent acts authorizing the issue of bonds and stocks. Thereafter, by the act of December 22, 1893 (21 Stat. 420), the legislature authorized the State Treasurer to refund in Redemption Brown Consols the valid principal, with interest, to July 1, 1893, of all bonds and stocks then fundable in Brown Consols. Doubtless this act was found to be necessary because of the specific limitation both in the title and in the body of the act of 1892 of the use of the issue of bonds and stocks therein authorized and the proceeds of the sale thereof to the redemption of Brown Consols. There are

still outstanding certain Green Consols which have not been refunded.

The petitioner contends that the act of 1912 does not authorize the refunding of these outstanding Green Consols, for two reasons: 1. Because the body of the act not only does not authorize it, but forbids the refunding of any, except Brown Consols; 2. Because, if the body of the act can be properly construed as authorizing the refunding of Green Consols, it violates the Constitution and is void to that extent, because that subject is not expressed in its title.

This contention must be sustained upon both grounds. While the act is by no means as clear as it should have been upon this subject, yet we think, taking all of its provisions together, and considering them in the light of the other acts upon the same subject, the intention to be gathered from the language used prohibits the funding of any except the Brown Consols, issued under the act of 1892. The only provisions of the act upon this subject are found in sections 6 and 7. Section 6, after authorizing the sale of the issue by the commission, provides that "the proceeds thereof shall be applied to the payment of the said Redemption Bonds and Stocks, issued under the act of 1892, and the consolidated bonds and certificates of stock, commonly called Brown Consols, and to no other purpose." Section 7, after providing for the sale and registry of the bonds and stocks, says: "And the proceeds of such sales shall be kept as a separate fund to be used exclusively for the final redemption of such Brown Bonds and Stocks, issued under the act of 1892, and said consolidated bonds and certificates of stock hereinbefore described as shall not be exchanged for the bonds and certificates of stock the issue of which is provided for in this act: *Provided, however,* That the Sinking Fund Commission, if in their judgment it is best to do so, shall have authority to exchange, in whole or in part, the new four per cent. bonds for Brown Consols upon such terms as may best subserve the public welfare." Counsel for the commission admit

that section 6 limits the use of the proceeds of sale to the payment of Redemption Brown Consols, issued under the act of 1892, and to Brown Consols, but they contend that the provision of section 7, above quoted, is inconsistent therewith, and, being last, it should control. But when we construe the provisions of both sections together, in the light of the other parts of the act, as we must, there is no inconsistency. Section 6 refers to two well known classes of Brown Consols, to wit, Redemption Brown Consols, issued under the act of 1892, and Brown Consols, issued under previous acts. Section 7 refers to the same two classes, *first,* "such Brown Bonds and Stocks issued under the act of 1892," and *second,* "said consolidated bonds and certificates of stock hereinbefore described," which can certainly as clearly be referred to the Brown Consols mentioned in section 6 as to any other, and when so referred there is no inconsistency in the terms of the statute. When there are two possible constructions of the provisions of an act, one of which makes them consistent with each other, and the other makes them inconsistent, the former must be adopted.

While the body of the act does authorize the redemption of both Redemption Brown Consols and Brown Consols, the title specifically limits the act to the redemption of bonds and stocks issued under the act of 1892, namely, Redemption Brown Consols. While the Courts construe the provision of the Constitution in question (that an act shall relate to but one subject which shall be expressed in its title) very liberally to the end that legislation shall not thereby be needlessly hampered and embarrassed, still, when the title of an act definitely and specifically limits its subject, as that of the act of 1892 does, to the redemption of a particular and specified issue of bonds, the Court must limit the operation of the act to the subject so expressed in the title. Otherwise, the provision of the Constitution in question would be set at naught. The legislature may have had good reasons for limiting the commission to the redemption of the consols

issued under the act of 1892. But it is not for us to inquire whether it had any reasons, or whether they were good or bad, or whether the failure to provide for the redemption of all the outstanding obligations of the State is only a *casus omissus.* In either event, we have no power to dispense with the mandate of the Constitution. The commission is, therefore, limited to the redemption of Redemption Brown Consols issued under the act of 1892.

It is argued, however, that Green Consols are, by the act of 1893, fundable in Redemption Brown Consols, and, this being so, the holders thereof could have them so refunded, and then the commission could refund the latter, and that, as the law does not require the doing of useless things, such circuitous proceeding should be unnecessary. On the other hand, the Court can not sanction the doing of that by the commission which is positively forbidden by the legislature. Moreover, the commission can not issue bonds or stocks under the act of 1892. Under that act, bonds and stocks were issued by the treasurer. Whether the treasurer can still issue Redemption Brown Consols, under the act of 1892, to refund Green Consols is a question which we are not called upon to answer.

The next question is whether the commission has authority to refund Redemption Brown Consols, issued under the act of 1893, as consols issued under the act of 1892. As we have seen above the act of 1893 was clearly intended as an amendment supplementing the act of 1892, whereby its scope was enlarged so as to permit the refunding not only of Brown Consols, but also of all outstanding obligations fundable in Brown Consols. The act specifically requires that the consols issued thereunder shall be of the kind issued under the act of 1892, known as Redemption Brown Consols, and the consols issued under the act of 1893 recite on their face that they were issued under that act. As we shall presently see, the State is estopped to deny that they were so issued.

We proceed next to dispose of the objections to refunding certain bonds and stocks which are made in the following subdivisions of paragraph 20 of the petition.

20. "Certain bonds and stocks about to be refunded under the act of 1912 are not binding obligations of the State, and, therefore, such refunding will be an attempt to increase the indebtedness of the State for extraordinary purposes without an election, contrary to the provisions of section 11 of article X of the State Constitution, for the following reasons (a, b, e and j are hereinafter considered) :

"(c) Brown Consols predicated upon the $19,279.75 bills of the Bank of the State stolen and outstanding at the time of issuance of such Brown Consols, as stated in paragraph 16, are not binding obligations of the State, nor is any bond or stock whose origin is to be traced to said Brown Consols in so far as it rests thereon, because the issuance of said Brown Consols was an attempt to increase the debt of the State for extraordinary purposes without an election, contrary to article XVI of ·the State Constitution of 1868.

"(d) The act entitled 'An act to extend the time within which bills of the Bank of the State may be funded, and to provide the manner of funding the same,' approved December 24, 1880, above mentioned in paragraph 17, authorized until July 1, 1881, the presentation of bills of the Bank of the State for examination and exchange for Brown Consols. Section 5 of said act provided as follows: 'That from and after the first day of July, 1881, all action and right of action, claim and demand, whatsoever, upon the obligations of the corporation known as the president and directors of the Bank of the State of South Carolina, and incident to or growing out of said obligations, shall cease and determine, and from thenceforth shall be forever barred.' This act has never been amended or repealed. After July 1, 1881, the end of the period limited by said act, $36,139.34 of bills were presented, and $18,069.59 of Brown Consols were

issued in exchange. The issuance of said $18,069.59 of Brown Consols upon bills of the Bank of the State presented after the time limited for such presentation by the act of December 24, 1880, was unauthorized, and such Brown Consols are not binding obligations of the State, nor are any bonds or stocks resting upon such Brown Consols binding obligations in so far as they so rest.

"(f) In the months of July and September, 1893, but after July 1, 1893, $1,029.29 of Brown Consols were issued in exchange for other bonds and stocks as shown by the second schedule appended to paragraph 18 hereof, and immediately thereafter were redeemed by exchange for 4½% Redemption Brown Consols of like amount. As the acts providing for the issuance of Brown Consols directed that they should mature July 1, 1893, and therefore did not authorize the issuance of such Brown Consols after that date, and as the act of 1892 providing for the issuance of 4½% Redemption Brown Consols limited to July 1, 1893, the time within which Brown Consols could be exchanged therefor, said $1,029.29 of Redemption Brown Consols were issued without authority of law and are not binding obligations of the State. Moreover, the act of 1893 did not authorize the refunding by exchange of Brown Consols surrendered by persons other than the purchasers of the new consols, and said $1,029.29 of Brown Consols were surrendered by persons other than such purchasers.

"(g) Brown Consols in the aggregate amount of about $706,203.87 issued prior to July 1, 1893, were surrendered and exchanged for 4½% Redemption Brown Consols after that date, contrary to the above mentioned provisions of the act of 1892, limiting the time for such surrender and exchange, and, therefore, the 4½% consols issued in exchange for such Brown Consols were issued without authority of law.

"(h) A number of 4% Redemption Brown Consols issued under the act of 1889 as amended in 1890, were sur-

rendered after July 1, 1893, and new 4½% Redemption Brown Consols were issued in exchange. Section 15 of the act of 1892 authorized the surrender of 4% bonds and the issuance of such 4½% bonds in exchange therefor 'as provided in this act,' and the limitation of time for surrender and exchange of Brown Consols contained in this act must, therefore, be applicable also to the surrender and exchange of the 4% Redemption Brown Consols. The new 4½% consols issued in exchange for 4% consols surrendered after July 1, 1893, were, therefore, issued without authority of law.

"(i) At some time between the years 1893 and 1902, at least $14,500 of 4½% Redemption Brown Consol Bonds surrendered and exchanged for stock pursuant to said act of 1892, were not cancelled as required by said act, but were stolen by a clerk in the office of the State Treasurer. Seven thousand dollars of said stolen bonds have since been surrendered and exchanged for stock as provided in the act of 1892. Although the Supreme Court has held in the case of *Ehrlich* v. *Jennings, Treasurer,* 78 S. C. 269, 58 S. E. 922, that the State was estopped to deny the validity of one of said bonds which was in the hands of a *bona fide* purchaser, it has not been established that the others have reached the hands of *bona fide* purchasers, and until that fact be established, the issuance of new bonds and stocks predicated upon such other stolen bonds or stock issued in exchange therefor will be unauthorized by law, and contrary to the provisions of section 11 of article X of the State Constitution."

The following principles were established in the Bond Debt Cases, 12 S. C., 200, and the cases of *Robertson* v. *Tillman,* 39 S. C. 283, 17 S. E. 678, and *Ehrlich* v. *Jennings,* 78 S. C. 269; 58 S. E. 922.

1. The refunding of a valid existing debt does not increase the debt of the State, and, therefore, needs not the sanction of the qualified electors, which is required by sec-

tion 11 of article X of the Constitution before the public debt can be increased.

2. The liability of the State upon negotiable paper, issued by competent authority, is the same as that which attaches to private individuals under like circumstances.

3. Holders of such paper, in the absence of allegation to the contrary, are presumed to be innocent purchasers thereof for value, before maturity, and without notice of any objection to which it may be liable.

4. When authority to issue such paper exists, neither irregularities nor frauds on the part of the officers or agents of the State who are entrusted with the exercise of such authority, will affect it in the hands of such holders.

5. The State is estopped to deny recitals on the face of such paper in the hands of such holders.

Under the principles above stated, the objections made in each of the foregoing subdivisions must be overruled, because it is not alleged in the petition that any of the holders of the consols which the commission propose to redeem are not innocent purchasers thereof for value, before maturity, and without notice of the defects alleged; nor is it alleged that any of said consols are not rested upon valid debts of the State, or that they were fraudulent or void in their inception. Other reasons might be assigned, but we deem the foregoing sufficient.

The disposition of the remaining subdivisions of paragraph 20 depends somewhat upon other principles besides those above stated.

"(a) Green Consol Bonds and Stocks in the aggregate amount of $54,600, described by their numbers and denominations in the report of the bond commission, were reported by the bond commission to have been executed and issued after the terms of office of the officials who executed and issued them had expired, as stated in paragraphs 12 and 13, and said consols were therefore not binding obligations of the State. These Green Consols are

referred to in the following extract from section 15 of the 'joint resolution providing a mode of ascertaining the debt of the State and of liquidating and settling the same,' approved March 22, 1878: "That the bonds and certificates of stock and exchange and transfer certificates of stock mentioned in said report as issued by F. L. Cardozo as State Treasurer, the same being signed by D. H. Chamberlain as Governor, and countersigned by Thomas C. Dunn as Comptroller General, after the terms of these officials had expired, amounting in the whole to $54,600, be and the same are hereby declared to be in all respects as if the same had been issued before the expiration of the said terms of office of said officials, and the validity thereof shall be determined as hereinbefore provided. * * *' This provision did not operate to validate these Green Consols because such validation is not expressed in the title of said joint resolution, and because such validation would have increased the indebtedness of the State for extraordinary purposes without an election, contrary to article XVI of the State Constitution of 1868. None of said Green Consols, nor any bond or certificate of stock whose origin is to be traced to said Green Consols is a binding obligation of the State in so far as it rests thereon."

Under the decisions of this Court, construing and applying the provision of the Constitution in question the title of the joint resolution referred to in this subdivision is clearly comprehensive enough in the expression of its subject to embrace the validation of the issuance of these consols by the officers named after the expiration of their terms of office. The subject of the resolution was providing a mode of ascertaining the debt of the State. As to these consols, the mode provided as to the irregularity of their issuance, was the declaration, by the legislature itself, that they were, so far as that matter was concerned, a part of the valid debt of the State,—a matter clearly germane to the subject expressed in the title. They were validated only with respect to that irregularity. In all other respects, their

validity was, by the terms of the resolution, subject to the investigation and decision of the court of claims, just as if they had been issued by said officials while in office. There was no requirement of the Constitution that they should be issued by any particular officer or person. Therefore, it was competent for the legislature to provide that they should be issued by private individuals, as the agents of the State; and, of course, it had the power to ratify what it could have authorized in the first instance. *Morton Bliss & Co.* v. *Comptroller General,* 4 S. C. 430.

It is not alleged that these consols were not rested upon valid debts of the State. If they were, as we have seen, the refunding of them did not increase the debt of the State.

"(b) The act entitled 'An act to extend the time for funding the unquestionable debt of the State,' approved December 20, 1878, above mentioned in paragraph 14, authorized the refunding until October 31, 1879, of obligations issued prior to January 1, 1866, and no others. The act entitled 'An act to continue in force an act to extend the time for funding the unquestionable debt of the State,' approved December 24, 1879, above mentioned in paragraph 15, authorized the refunding until October 31, 1880, of obligations issued prior to January 1, 1866, and also obligations issued after that date which should be found valid by Special Commissioner Coit. The subject of refunding obligations issued after January 1, 1866, is not expressed in the title of the latter act as required by section 20 of article II of the State Constitution of 1868, and, therefore, no Brown Consols issued for such refunding pursuant to said act nor any bond or certificate whose origin is to be traced to said Brown Consols is a binding obligation of the State in so far as it rests thereon."

Neither the title of the act of 1878 nor that of 1879 mentions any particular debts of the State, the time for the refunding of which was extended. In both, the unquestionable debt of the State was the subject of the extension,—

without regard to whether it was issued before or after 1866. The subject expressed in the title of the act of 1878 is clearly broad enough to embrace the declaration by the legislature in the body of the act of what the unquestionable debt of the State consisted, which, at the date of that act, was confined to obligations issued prior to January 1, 1866. If, at that time, there had existed a class of obligations issued after January 1, 1866, which were considered unquestionable, it is clear that provision might have been made for refunding them also. If so, it is equally clear that it could have been made thereafter by amendment of the act; and the act of 1879 is, in effect, only an amendment of the act of 1878 (which was intended to be only of temporary force) continuing it in force and extending its provisions to another class of debts, to wit, those issued subsequent to January 1, 1866, which had been investigated and found to be valid by the special commissioner. It follows that this objection cannot be sustained.

"(e) The act of 1892, after authorizing the sale of the 4½% Redemption Brown Consols 'at not less than par or face value' and directing the application of the proceeds thereof to the payment of the Brown Consols and to no other purpose, authorized and required the State Treasurer to receive from the 'purchasers' of the new consols, who should surrender Brown Consols before July 1, 1893, all such consols tendered by them, and to issue new 4½% consols of equal face value in lieu of and in exchange for Brown Consols so surrendered. It was further provided that 'the 'holders' of the 4% Redemption Brown Consols should have the right to surrender them and receive in exchange therefor 4½% Redemption Brown Consols of equal face value 'as provided in this act.' The supplementary act of December 22, 1893, provided for surrender by the holders of all bonds and stocks refundable in Brown Consols and the issuance of 4½% Redemption Brown Consols directly in exchange therefor upon the same terms upon which they were refund-

able in Brown Consols. Five million four hundred and one thousand nine hundred and fifty-five dollars and eighty-six cents of the 4½% Redemption Brown Consols now outstanding were issued in the fiscal year ending October 31, 1893, and the remaining $220,556.11 were issued subsequently. Of the former, $5,250,000 were issued to a purchasing syndicate pursuant to a contract made in March, 1893, $150,926.57 were issued to holders of 4% consols in exchange for a like amount of such consols, and $1,029.29 were issued to holders of Brown Consols issued after July 1, 1893, in exchange for a like amount of such consols, making a total of $5,401,955.86. The syndicate purchased the new consols at 'par flat,' that is, at the face value, without including accrued interest, and made payment of $2,929,596.74 in cash and $2,320,403.26 in Brown Consols of equal face value, making a total of $5,250,000. The bonds issued to the purchasing syndicate and paid for in cash were issued at various times, beginning May 16, 1893, and ending July 8, 1893. The bonds issued to the purchasing syndicate and paid for in Brown Consols were issued at various times, beginning May 16, 1893, and ending July 10, 1893. The $5,250,000 of Redemption Brown Consols issued to the purchasing syndicate exceeded by $20,113.80 the amount ($5,229,886.20) of Brown Consols then outstanding and refundable under the act of 1892, as shown by the first schedule appended to paragraph 18. This over issue was due to the fact that in estimating the amount of Brown Consols to be redeemed on July 1, 1893, the date of their maturity, the officers who made the contract with the purchasing syndicate allowed some margin for such Brown Consols as might be issued between the date of the contract and July 1, 1893 (there being still outstanding many bonds and stocks exchangeable for Brown Consols), and the amount of Brown Consols issued during such period was not as large as was expected. Of the $2,929,596.74 in cash received in 1893 from the purchasing syndicate for Redemp-

tion Brown Consols, sold as aforesaid, the sum of $1,746.65 still remains in the treasury; the sum of $20,919.51 was applied in 1894 to the payment of Green Consols (without authority of law) ; and the remainder of the cash received from the purchasing syndicate was applied to the payment of Brown Consols. The issuance of said $20,113.80 of Redemption Brown Consols in excess of the amount of Brown Consols refundable under the act of 1892 was not authorized by the act of 1892, and was an attempt to increase the debt of the State without an election, in violation of section 11 of article X of the State Constitution of 1895. Said $20,113.80 of invalid consols were among $22,525.56 of consols issued on July 5, 6 and 8, 1893 (after issuance of all other consols sold to the syndicate and paid for in cash), and as they can not be distinguished by date of issue from the remaining portion of said $22,525.56 of consols, all of said $22,525.56 of consols must be deemed invalid. (State Treasurer's report for 1893, pp. 7, 8, 114.)"

The following findings of the referee, as to the allegations contained in this subdivision, to which no exception has been taken, show that this ground of objection cannot be sustained:

"I, therefore, conclude as matter of fact:

1. "That there was no over issue of Redemption Brown Consols under the act of 1892, and that the entire proceeds of said issue of bonds, with the exception of the sum of $1,746.65, now in the State treasury, has been used in the payment, redemption and retiring of Brown Consols and 4% Brown Redemption Consols.

2. "That no part of the said sum of $20,113.80, being the difference between the proceeds of sale of the Redemption Brown Consols and the amount of outstanding Brown Consols refundable under the act of 1892, as shown by the treasurer's report and alleged in said subdivision (e) of said paragraph 20 of petition, was used in the payment or

redemption of Green Consols, but that the whole of said sum, with the exception of the amount now remaining in the treasury, was used for the payment, redemption and retiring of Brown Consol Bonds and Stocks."

"(j) In the present year, $1,160 of Redemption Brown Consols were issued in exchange for coupon bonds and coupons of the issue known as Funding Bills of the Bank of the State Bonds, pursuant to an act passed in January, 1912 (27 Stat. 922). As said bonds matured in 1888, they and the coupons thereof ceased in 1908 to be debts of the State, by reason of the act approved February 25, 1896, entitled 'an act to limit the time in which coupon bonds payable to bearer and their coupons of the State may be consolidated, converted, funded or paid, and to repeal conflicting laws,' which act prohibits the refunding of coupon bonds and coupons thereof after the expiration of twenty years from the date of maturity of such bonds. The attempt to revive said debts by said act of 1912, and the refunding thereof by exchange for Redemption Brown Consols constituted an attempt to increase the indebtedness of the State without an election, in violation of section 11 of article X of the State Constitution, and, therefore, said $1,160 of Redemption Brown Consols are not binding obligations of the State."

The effect of the act of 1896 was not to destroy any valid bond debt of the State, after the expiration of twenty years from the maturity of such bond, but it was merely to prevent the treasurer from refunding any such bond after the lapse of that time. It is a well settled principle of law that the fact that a debt may be barred by a statute of limitations does not affect its validity, or the moral obligation to pay it. It is none the less a debt. The only effect of such a statute is to close the door of opportunity afforded by the law to collect it. Therefore, providing for the payment or refunding of such a debt does not increase the debt of the State. In

numerous other instances mentioned in the petition the bar of a statute was removed by subsequent legislation.

The petitioner's next contention is that, though the consols issued under the act of 1892 are all dated January 1, 1893, they were not actually issued until later dates, and as the act reserves to the State the right to redeem them at any time after twenty years from "the date of issue," the commission have no right to call and redeem them until after twenty years from the dates when they were actually issued.

The phrase "date of issue" means the date which the bonds and stocks bear, and not the date when they were actually issued, in the sense of being signed and delivered and put into circulation.

The act of 1892 provides that the Sinking Fund Commission shall invest all sums which may come into their hands from time to time in the consols issued under that act and hold same as assets of the sinking fund, collecting the interest thereon, and reinvesting the same in said consols, so that the sinking fund should be cumulative. Petitioner, therefore, contends that the commission have no right to cancel the Redemption Brown Consols which they have called for payment, but should hold the same as assets of the sinking fund under the aforesaid provision of the act.

That provision of the act was intended to make the sinking fund cumulative, only until the time should arrive for the final redemption of the bonds and stocks for the payment of which it was set apart, when, of course, it was intended that it should be used for that purpose. That time has arrived, and, by the express terms of the act, the State now has the right to call in and pay or redeem the whole or any part of the bonds and stocks issued under that act. Therefore, the commission should cancel the bonds and stocks so redeemed.

It is, therefore, ordered, that the commission be at liberty to carry out the provisions of the act of 1912 in accord with the views and principles herein announced.

MR. JUSTICE WATTS. While I do not think there was a quorum present at the meeting on December 13, 1913, as Hon. W. L. Mauldin, chairman of Finance Committee of the Senate, was dead, and Hon. L. J. Browning's, chairman of Ways and Means Committee of the House of Representatives, term had expired, his successor elected as a Representative, yet for the reasons given by Mr. Justice Hydrick, I think this was not fatally defective, and I concur in the result of his opinion.