WILLIAMS MANUFACTURING COMPANY *vs.* STANDARD BRASS COMPANY.

Middlesex.    March 8, 1899. — May 18, 1899.

Present: HOLMES, KNOWLTON, LATHROP, BARKER, & HAMMOND, JJ.

*Construction of Contract — " Dissatisfaction."*

By one clause of a contract in writing A. agreed " to place the above named outfit in operation for sixty days' trial for the approval of the second party (B.), and if the results obtained after the trial are in accordance with the specifications above and satisfactory to the second party, the second party further agrees to pay for the above named equipment," etc.  In an action by A. against B., it appeared that the work was done in accordance with the specifications of the contract, and in such a way as to be satisfactory to a reasonable man.  B., how-

ever, was not satisfied, and stopped the experiment before the sixty days had elapsed. *Held*, that *bona fide* dissatisfaction was an answer to the plaintiff's claim, and the defendant was not bound to wait sixty days.

CONTRACT, for the construction of an equipment for melting brass for the defendant. Trial in the Superior Court, before *Sherman*, J., who allowed a bill of exceptions in substance as follows.

The contract provided that the plaintiff should furnish to the defendant an apparatus for melting. brass, erecting the same in the defendant's foundry in Cambridgeport, and use crude oil as fuel, after being treated by the Strait process. The plaintiff was to furnish one generator equipped with duplicate pumps, gauges, etc. ; one six horse-power boiler and base complete, fitted with injector, steam gauges, etc.; five burners of sufficient capacity to operate ten furnaces, and to melt twelve pounds of brass and copper suitable for casting for each gallon of oil burned, and to melt the same in quantities of 130 to 150 pounds every 100 minutes to each furnace, and this without expense except for the oil burned. The defendant agreed to bring the oil to the generator, furnish pipes necessary to connect the boiler to the generator and the generator to the five furnaces, and to furnish fire brick necessary to build furnaces. The plaintiff agreed further to send a competent man to set up the equipment, make connections, and instruct the defendant in its proper use, " to place the above named outfit in operation for a sixty days' trial for the approval of the second party, and if the results obtained after the trial were in accordance with the specifications above, and satisfactory to the second party, the second party further agrees to pay for the above named equipment the sum of $550."

It appeared that in January, 1896, Kermeen, the plaintiff's agent, went to the defendant's foundry in Cambridgeport with Strait, the inventor of the process, for the purpose of setting up the equipment; that Strait set up two of the furnaces, the boiler, the generator, and the pumps, connected them with the furnaces, proceeded to make tests with the apparatus, the oil being furnished by the defendant company; that Strait continued at the foundry of the defendant until February 21, 1896 ; that on or about February, 1896, Strait was informed by the president of the

defendant that he was not satisfied with the tests; that four or five days after this interview, Kermeen and Strait went to the defendant's place of business and offered to put in the remaining furnaces and pipes and burners; that Paine, the president of the defendant company, replied that the equipment was not satisfactory, was not economical, and was subject to other objections; that he did not wish the plaintiff to put in the remaining furnaces, or continue to operate the equipment, and that Strait might as well go home and save further expense. The plaintiff's evidence tended to show that it had melted metal in the quantities and time required by the specifications, and that metal so melted was suitable for castings, and that it was more economical to melt brass with this process than with coal. There was conflicting evidence as to whether the defendant had furnished sufficient quantities of oil and whether the tests were delayed and hindered by the defendant's neglect to furnish oil when requested. It appeared that during the time Strait was at the defendant's foundry, namely, from January 16, until February 21, 1896, there were only four barrels of oil furnished and that Strait complained to the defendant that this was not the kind of oil required.

It appeared from the plaintiff's evidence that one barrel of oil would not run the equipment and two furnaces continuously for one whole day.

It appeared that during the course of the trial a printed diagram was shown to the jury for the purpose of illustration, representing Strait's process, and that the defendant did not contend that the plaintiff was required to furnish an apparatus in all respects like that shown in the said diagram.

It appeared that the pump furnished by the plaintiff with the equipment would do double as much work, and was a far better pump than the single acting pump; and that the pump was used simply to fill the generator, and had nothing to do with the working of the apparatus.

Among other requests for instructions, the defendant asked the following: "Second. That even if said equipment could melt twelve pounds of brass and copper, suitable for castings, for each gallon of oil burned, and could melt the same in quantities of 130 to 150 pounds every 100 minutes to each furnace,

yet if such melting was not sufficient for castings such as the defendant made, the defendant would have the right to refuse to accept and pay for said equipment."

The judge submitted the following questions to the jury: "1. Did the plaintiff furnish the equipment and materials of the kind, quality, and capacity, and perform the tests and work in accordance with the specifications of the contract? 2. If the plaintiff had continued to operate the outfit for a sixty days' trial would it have complied with all the requirements and specifications of its contract? 3. Did the plaintiff furnish the equipment and materials and perform the tests and work in accordance with its contract and in such a way as to be satisfactory to a reasonable man? 4. If the plaintiff had continued to operate its outfit for a sixty days' trial, would it have proved satisfactory to a reasonable man? 5. If the plaintiff had continued to operate its outfit for a sixty days' trial, would it have proved satisfactory to the defendant?"

The jury answered all of these questions in the affirmative.

The defendant thereupon submitted in writing a request that the following additional instructions be given: "1. That the plaintiff is entitled to nominal damages only, if any. 2. That the plaintiff's damages, if any, should be the contract price, less the expense to it of the equipment furnished and the expense of setting up said equipment and operating it."

The judge refused to give the first of these rulings, and the defendant excepted. The jury were then sent out again, being instructed to find a verdict for the plaintiff, and to assess the damages according to the defendant's second request.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*S. H. Tyng*, (*P. G. Bolster* with him,) for the defendant.

*A. J. Daly*, for the plaintiff.

HOLMES, J. This is an action upon a contract under which the plaintiff constructed an equipment for melting brass for the defendant. The contract was in writing. By one clause of it the plaintiff agreed "to place the above named outfit in operation for sixty days' trial for the approval of the second party, and if the results obtained after the trial are in accordance with the specifications above and satisfactory to the second party, the second party further agrees to pay for the above named

equipment the sum of $550." Upon the findings of the jury, it must be taken that the work was done in accordance with the specifications of the contract, and in such a way as to be satisfactory to a reasonable man. The defendant, however, was not satisfied, and stopped the experiment before the sixty days had elapsed.

The questions raised by the exceptions are whether the defendant's liability was conditioned upon actual satisfaction, even if the dissatisfaction was unreasonable, so long as it really was felt, and perhaps whether the defendant was bound to let the experiments continue for sixty days. We are of opinion that the defendant did not lose its right to insist upon its fundamental defence by the course of the trial. We are of opinion, also, with some slight hesitation on my part, that the defendant's liability was conditioned as above suggested, and that *bona fide* even if unreasonable dissatisfaction of the defendant is an answer to the plaintiff's claim. The plaintiff undertakes to put in the work "for the approval of the" defendant, and the defendant undertakes to pay only if the results are in accordance with the specifications "and satisfactory" to it. The exceptions state the substance of the evidence, but it does not appear to be material except so far as it shows that putting in the proposed equipment involved a considerable change in the defendant's business, and that it seems to have been regarded as more or less of an experiment, which facts confirm and give a reason for the interpretation which we adopt. Furthermore, the contract does not provide a test alternative to satisfaction, as was the case in *Hawkins* v. *Graham*, 149 Mass. 284, where the money was to be paid after acknowledgment of satisfaction by the defendant "or the work demonstrated." It almost follows from our interpretation that, as soon as the defendant was convinced that the work was unsatisfactory, it had a right to stop it. The provision for sixty days' trial was an undertaking of the plaintiff for the defendant's advantage, to insure it whatever knowledge it wanted in order to decide.

We have assumed, without discussion, that the defendant was bound to good faith in deciding and in expressing its decision, and that such an arrangement limited its absolute freedom to do as it chose sufficiently to be entitled to the name of a contract.

*Exceptions sustained.*