CONSOLIDATED ENGINEERING CO., ET AL. *v.*
BERNARD B. FEIKIN

[No. 122, October Term, 1946.]

*Decided May 14, 1947.*

422

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Robert E. Coughlan, Jr.,* for the appellants.
*Maurice J. Pressman* for the appellee.

DELAPLAINE, J., delivered the opinion of the Court.

On July 20, 1945, Louis Saunders, now deceased, an employee of Consolidated Engineering Company, contractor, was disabled by severe burns sustained in the hot strip mill of the Bethlehem Steel Company at Sparrows Point. On December 1, 1945, the State Industrial Accident Commission found that the employee's disability was the result of an accidental injury arising out of and in the course of his employment, and awarded him workmen's compensation at the rate of $25 per week, payable during temporary total disability. From that order the employer and the Maryland Casualty Company, insurer, entered an appeal to the Court of Common Pleas of Baltimore City. On July 11, 1946, pending their appeal, the claimant died in the Crownsville State Hospital from posttraumatic epilepsy with psychosis. Bernard B. Feikin, administrator of his estate, was substituted in his place. At the close of appellants' case, the trial judge directed a verdict affirming the decision of the Commission. The employer and

the insurer then appealed here from the judgment on the verdict.

It appears that in April, 1945, the claimant sustained an injury to his head, but not in the course of employment. From that time until June he was confined in a hospital. On Monday, July 16, 1945, he returned to the Consolidated's office, a shack on the steel company's property, and the Consolidated's superintendent, Jacob J. Wildman, gave him a job in the steel company's hot strip mill, a building measuring about 2,000 feet from one end to the other. Near the south entrance are the furnaces, from which molten steel is poured into sheets. These sheets are then thrown on huge rollers, which roll them to the desired thickness. The sheets are then cut into strips of different sizes, and the strips, while still hot, are stacked in the strip finishing department. Here an electric crane with large hooks picks up and carries the strips of steel in different directions. Next to the strip finishing department are two slab yards, to which the slabs of steel are hauled in cars operating on tracks. Opposite the slab yards are the office of the superintendent of the mill and toilets for the employees. At the north end of the building are the "picklers," where the steel strips are put through a process. All of the mill operations are obviously very dangerous. Throughout the entire length of the building yellow lines about 10 feet apart have been painted on the concrete floor to indicate pathways for the employees. The Consolidated's superintendent sent the claimant to Jack Moore, a labor foreman, who had charge of a gang of workmen cleaning debris in the north slab yard; but Moore, not needing him, sent him to Carroll Blair, another foreman, whose gang was working in the south slab yard.

The claimant worked all day on Monday, July 16, but did not appear on Tuesday, Wednesday or Thursday. On Friday, the regular pay day, he appeared at the office to get his pay slip for one day's work. The laborers reported for work at 7:30 a. m., but the claim-

ant, not intending to work that day, did not arrive until about 10 a. m. He was informed by the timekeeper that the superintendent had his pay slip. It was the custom of the superintendent to distribute the pay slips on Friday morning, and the workmen were required to come to the office for their wages between 3 and 4 o'clock in the afternoon. The claimant asked the time-keeper where his gang was working, and he replied that they were probably at the same place where he left them on Monday. At that moment the superintendent appeared, and handed the claimant his slip. The claim-ant told the superintendent: "If I feel on Monday like I am feeling today, I will be back to work again." Shortly afterwards the claimant went to the hot strip mill. About 11:45 a. m. he found Moore's gang at the north slab yard. He asked Moore where Blair's gang was working, and Moore replied that he supposed they were still working where they were on Monday.

About 12:30 p. m. the claimant was found lying in the pathway in the strip finishing department. No one saw him fall. He was near a lot of hot steel strips piled along the yellow lines. He was severely burned on his face, hands and other parts of his body. Car-ried to the steel company's clinic, he was given first aid by a physician at 12:40 p. m. He was attacked by a number of epileptic convulsions. He was then removed to the Maryland General Hospital in Baltimore, where he was a patient for seven weeks, during which period he tried several times to escape. His face was scarred, and his left hand was contracted as a result of the burns.

An injury to an employee "arises out of" his em-ployment within the meaning of the Maryland Work-men's Compensation Act, Code, 1939, Art. 101, sec. 14, when it results from some obligation, condition or inci-dent of the employment. Whether an accident causing an injury to an employee resulted from some obliga-tion, condition or incident of the employment depends upon the circumstances of each particular case. *Spencer*

*v. Chesapeake Paperboard Co.,* 186 Md. 522, 47 A. 2d 385. An injury "arises out of" employment when, after consideration of all the facts and circumstances of the case, it is apparent to the rational mind that there was a causal connection between the conditions under which the work is required to be performed and the ensuing injury. An injury arises "in the course of" employment when it occurs while the workman is doing the duty which he is employed to perform. The causative danger must be incidental to the nature of the business, and not independent of the relation of master and servant. If the injury can be seen to have followed as a natural incident of the work, and to have been contemplated by a reasonable person familiar with the situation, as a result of the exposure occasioned by the nature of the employment, it may be said to have arisen out of the employment. On the other hand, it is not the purpose of the Workmen's Compensation Act to impose upon the employer the obligation of a general insurer, and it should not be so construed as to allow compensation in any case in which the injury which is the basis of the claim cannot be attributed to some service or act in the employment or found to be reasonably incidental thereto, but ensues from a hazard to which the workman would have been equally exposed apart from his employment. *Owners' Realty Co. v. Bailey,* 153 Md. 274, 284, 138 A. 235; *Hill v. Liberty Motor & Engineering Corporation,* 185 Md. 596, 45 A. 2d 467; *Rice v. Revere Copper & Brass, Inc.,* 186 Md. 561, 48 A. 2d 166.

It is acknowledged that a contract of employment is not necessarily terminated when the actual work ceases, but may continue until the workman's wages are paid. This view was announced in England in 1907 in *Lowry v. Sheffield Coal Co.,* 24 Times L. R. 142, 1 B. W. C. C. 1, where a collier quit work on Saturday at 5 a. m., and expected to resume work on Sunday night, but at noon on Saturday, while walking along a footpath on the employer's premises on the way to the office to get

his wages, he was knocked down by an engine moving along a railway line which ran into the employer's premises. The rule was reaffirmed in 1911 in *Riley v. Holland & Sons*, 1 K. B. 1029, 4 B. W. C. C. 155, where a female mill worker, who quit work on Wednesday, went to the mill on Friday, the regular pay day, to get her wages, and was injured when she slipped on her way down the steps from the pay office. In both cases it was held that the injuries arose out of and in the course of employment.

It is accepted that, where no provision is made by contract as to place of payment, the debtor must, if both he and the creditor are residents of the same State, seek his creditor in order to make payment of the indebtedness. *Pennsylvania Lumberman's Mutual Fire Insurance Co. v. Meyer*, 197 U. S. 407, 25 S. Ct. 483, 49 L. Ed. 810; 40 *Am. Jur., Payment*, sec. 17. But this rule has no application in modern industrial plants employing a large number of workmen. The established custom, under which the workmen are required to appear at the employer's pay office for their wages on or after the regular pay day fixed by the employer, becomes a part of the contract of employment. *Parrott v. Industrial Commission of Ohio*, 145 Ohio St. 66, 60 N. E. 2d 660; 1 *Honnold, Workmen's Compensation*, sec. 106.

In the present case, however, the claimant received his pay slip in the morning, and he knew that he could not get his pay until about five hours later. It was strongly urged that a workman, after getting his pay slip in the morning, ought not to be expected to make a trip of twelve miles back to Baltimore and then return to Sparrows Point the same day to get his pay. The superintendent testified that, during the World War, when this accident occurred, the men who were not working on pay day would come early in the morning and "hang around until they got their money." However, the claimant knew that the paymaster was the only person who would pay the money, and he would not pay it in the hot strip mill. Having been employed by the Consoli-

dated for about two years, he knew the regulation that the workmen were required to present their pay slips at the office window.

The claimant in this case did not report for work on July 20, the day of the accident. He told the superintendent that he would report on the following Monday, if his health permitted. There was nothing in the nature of the employment that required him to perform any service for his employer on the day of the accident in the Bethlehem Steel Company's hot strip mill. He was a day laborer, who performed only those duties which were assigned to him, and was paid only for the hours when he worked. Obviously it cannot be ruled as a matter of law that an injured workman, who had no duties to perform on the day of injury, is entitled to compensation merely because he sustained his injury at the place where he had been working previously. It was argued that the claimant might possibly have visited the hot strip mill to tell Blair, the labor foreman, that he was planning to come back to work on the following Monday. But it was the superintendent, and not the foreman, who hired the laborers. It is our opinion that the evidence did not warrant the trial court in ruling as a matter of law that the claimant's disability was the result of an accidental injury arising out of and in the course of his employment. The jury might have reasonably inferred that the claimant, having five hours to idle away before he could receive his pay, visited the hot strip mill to talk to some of the men in his gang on some personal matter.

Finding that the trial court erred in directing a verdict affirming the decision of the Commission in favor of the claimant, we must reverse the judgment and award a new trial. On an appeal from a decision of the Industrial Accident Commission, the question whether the claimant's injuries arose out of and in the course of his employment is for the jury, and the trial judge has no right to control the exercise of the jury's function to weigh the credibility of the evidence. Code, 1939,

Art. 101, secs. 14, 70; *Jewel Tea Co. v. Weber,* 132 Md. 178, 182, 103 A. 476; *Spencer v. Chesapeake Paperboard Co.,* 186 Md. 522, 47 A. 2d 385. In fact, if there is no legally sufficient evidence from which it might reasonably be inferred that the claimant visited the hot strip mill on some matter in connection with his employment, the verdict should be directed in favor of the employer and insurer.

*Judgment reversed, and case remanded for a new trial, with costs.*