**DEERING MILLIKEN RESEARCH CORPORATION, Plaintiff,**

v.

**TEXTURED FIBRES, INC., Virginia Mills, Inc. and Throwing Corporation of America, Defendants.**

**Civ. A. No. 68–705.**

United States District Court,
D. South Carolina,
Spartanburg Division.

March 3, 1970.

------

Thomas A. Evins, Means, Evins, Browne & Hamilton, Spartanburg, S. C., Simon H. Rifkind, and Jay Greenfield, New York City, for plaintiff.

Edward P. Perrin, Perrin & Perrin, Spartanburg, S. C., and McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION and ORDER

DONALD RUSSELL, District Judge.

By its order of remand, the Circuit Court of Appeals directed this Court in this proceeding to answer three questions, supporting same with appropriate findings of fact. Deering Milliken Research Corp. v. Textured Fibres, Inc. (1969) 415 F.2d 875, 877, note 4. These three questions are:

(1) Are the contracts sued upon contracts "to be performed in whole or in part by either party in South Carolina" within the meaning of § 10.2–803(1) (g)?

(2) Is § 10.2–803(1) (g) as applied to this case valid under the Fourteenth Amendment to the United States Constitution?

(3) Is § 10.2–803(1) (g) valid under Article III, Section 17 of the Constitution of South Carolina?

Pursuant to such mandate, I make, on the basis of the record presented by the parties, the following Findings of Fact:

## FINDINGS OF FACT

(1) The plaintiff is a corporation of South Carolina, which, by corporate merger effected in 1967, acquired all the assets, including contractual rights, of a Delaware corporation of like name.[1] It is engaged in textile research and development and in that connection maintains extensive laboratory and testing facilities at its headquarters in Spartanburg, South Carolina. In its laboratory and testing facilities, it seeks to develop new methods of textile manufacture and new textile products, for some of which patents are sought. It, also, attempts to secure exclusive legal rights to patents developed by others, basically in the textile field. In connection with patents owned by it or to which it has acquired exclusive rights, it grants licenses, furnishing, in some instances, at least, technical information and assistance in connection with such patents and their uses to its licensees.[2]

(2) The defendants Virginia Mills and Throwing Corporation of America were at the time of the commencement of this action North Carolina corporations, engaged in the textile business in that State; the defendant Textured Fibres, Inc. is a Delaware corporation, similarly engaged in textile business with its principal office and place of business in North Carolina.

(3) The plaintiff, at all times hereinafter stated, had the exclusive license in the United States from the French owners of certain inventions and patents for making crimped yarns, with the authority to grant such licenses for the use of such patents in the United States. These patents are generally identified by the parties as the FT patent rights

---

1. Since there has been no change in corporate name or real entity, only in State of incorporation, the term "plaintiff" will be used hereafter to apply indiscriminately either to the Delaware corporation or the South Carolina corporation.

2. See Throwing Corp. of America v. Deering Milliken Research Corp. (D.C.N.C. 1969) 302 F.Supp. 487, 490; affidavit of Armitage, p. 22a, Appellant's Main Brief and Appendix on appeal in Deering Milliken Research Corporation v. Textured Fibres, Inc., et al.

and the manufacture thereby covered is described by the parties as the "ARCT" program.

(4) On September 25, 1963, the plaintiff and the defendant Virginia Mills, Inc. (to whose rights and duties thereunder the defendant Throwing Corporation of America subsequently succeeded and thereafter, in 1967, the defendant Textured Fibres, Inc. "succeeded to the same rights and duties") [3] entered into a sub-license agreement, dealing with such FT patents and the processes thereby covered, and, on May 1, 1964, the plaintiff and the defendant Textured Fibres, Inc., entered into a similar agreement. The record before the Court is silent on the negotiations between the parties preceding the execution of the contract.[4]

By the terms of these agreements, the plaintiff granted to the defendants "a nonexclusive and nontransferable use license * * * to use the FT processes and FT machines for the purpose of making for use and sale crimped yarns in accordance with technical information and the inventions of said FT PATENT RIGHTS." In order to facilitate and promote the use of such patent rights by the defendants, the plaintiff agreed, also, (1) to furnish the defendants "such additional technical information and 'knowhow' as is necessary in DMRC's opinion to enable LICENSEE (defendants) to practice the inventions licensed hereby", (2) to provide "further additional information as it similarly deems necessary to supplement information heretofore furnished", (3) to "disclose to LICENSEE (defendants) said additional information and 'knowhow' after mill test has in DMRC's judgment confirmed that an improvement has been made and within sixty (60) days after the improvement has in DMRC's judgment been successfully reduced to practice in commercial production", (4) to grant to the defendants licenses to use any improvements acquired in such patents, (5) to instruct the personnel of the defendants, at the laboratories of the plaintiff, or at such other places as may be agreeable to the parties, "as to the best methods of practicing these inventions", and (6) "upon terms to be mutually agreed upon", to send technical personnel to the plants of the defendants "for the purpose of instructing" defendants' employees "in the said best methods of practicing the inventions."

In return, the defendant agreed to pay a fixed annual minimum royalty of $1,000 and a percentage royalty as calculated on the sales or use by the defendants of yarn processed under the patents licensed. The defendants also bound themselves to keep accurate records necessary to the computation of such royalty payments, and to furnish the plaintiff "on or before the tenth day of each calendar month a certified statement" of all yarn processed under the licenses, accompanied by payment of the agreed royalty based on such production. Such statements, as well as the accompanying payments were to "be sent by registered mail to DMRC at P. O. Box 1927, Spartanburg, South Carolina, U. S. A. * * *" or "at such other address as such party may hereafter in writing designate by written notice to the other." The plaintiff did not change the address at which payment of the royalty was to be made by the defendants.

These agreements were executed by the plaintiff in Spartanburg, South Carolina, and by the defendants in North Carolina.

---

**3.** See, paragraph 3 of the Complaint. There is no denial of such allegations by the defendants.

**4.** Cf., Thompson v. Ecological Science Corporation (D.C.Ark.1969) 295 F.Supp. 1307, p. 1311:
  "There can be no question that negotiations taking place within a given State and looking toward the formation of a contract constitute a significant contact with that State and are a significant factor to be considered in determining whether the nonresident individual or corporation is subject to the jurisdiction of the courts of that State."

(5) The technical information supplied its sublicensees by the plaintiff, as provided for in its sub-licenses to the defendants, in order to enable such sublicensee to practice the invention, resulted almost entirely from research, testing and development work carried on by the plaintiff at its headquarters and laboratories in Spartanburg, South Carolina.[5] A significant portion of such technical information and "knowhow" was developed by the scientists and engineers employed by the plaintiff at its laboratory in response to requests from its sub-licensees, such as the defendants, made as a part of their rights under the terms of their sub-license. To provide this service, as contemplated by its sub-license contracts, the plaintiff maintained a substantial staff of scientists and engineers at its Spartanburg headquarters and laboratories.[6]

(6) The machines used in the manufacturing processes covered by such patent rights were manufactured in France and were purchaseable exclusively from French manufacturers. However, the right to purchase or use such machines in the United States depended upon acquiring a sub-license from the plaintiff.

(7) Some time after acquiring their sub-licenses, the defendants purchased the necessary machines from the French manufacturers for the processing of yarn as permitted under such sub-license.

(8) Beginning a short time after securing its sub-license, the defendant Virginia Mills, Inc., and its successor and co-defendant Throwing Corporation of America, regularly made requests of the plaintiff at its headquarters and laboratory at Spartanburg, South Carolina, for technical assistance, laboratory testing and "know-how" information, practically all of which was furnished such defendants through work done and performed by the plaintiff by its technical services unit, at its headquarters and laboratory in Spartanburg, South Carolina. These requests for "technical service" began in March, 1964,[7] and continued rather constantly until as late as April, 1967. For instance, at the outset the said defendants requested an evaluation of certain yarns, through testing in plaintiff's laboratory, to develop the necessary "FT-3 specifications to reproduce" certain samples furnished the plaintiff's technical service unit. The nature of these requests for technical assistance was further illustrated by the request of these defendants for the plaintiff to develop at its technical service unit in Spartanburg, "a complete operating procedure for the subjecting of Vycron yarn to the FT process," to be used by the defendants in processing yarn under the FT patents. On a succession of occasions, the plaintiff was, also, asked by these defendants to make tests at its laboratory in Spartanburg, South Carolina, on various yarns to determine the proper use of such yarns under the FT process and patents and the plaintiff conducted such tests and experiments, furnishing the said defendants with technical advice in that connection as well as with the results of such tests.[8]

5. See affidavit of Armitage, p. 22a, Appellant's Main Brief and Appendix on appeal.

6. See Throwing Corp. of Amer. v. Deering Milliken Research Corp., *supra*, at p. 489 of 302 F.Supp.
   See, Affidavit of Sawyer, pp. 36a–37a, Appellant's Main Brief and Appendix on appeal.
   Affidavit of Lenderman, p. 66a, Appellant's Main Brief and Appendix on appeal.
   Affidavit of Reeves, p. 77a, Appellant's Main Brief and Appendix on appeal.

7. Actually, the request originated in December, 1963, but there was some difficulty in arranging for the attendance of the necessary personnel.

8. See, Exhibit 4, March 12, 1964,
   Exhibit 7, April 1, 1964,
   Exhibit 10, July 9, 1964,
   Exhibit 14, April 29, 1965,
   Exhibits 15 and 16, May 5 and 11, 1965, respectively,
   Exhibits 17, 18, 19 and 20, May 19, 1965, to June 4, 1965,
   Exhibits 21, 22 and 23, June 15, 1965, to July 26, 1965,
   Exhibit 24, August 27, 1965,

For none of these technical services and tests did the plaintiff make any charge against the defendant Virginia Mills, Inc. or its successor corporation; and the dealings between the parties, as evidenced by the written record in this case, showed clearly that the services rendered such defendants by the plaintiff at its Spartanburg laboratory in this connection were regarded by the parties as an integral part of the plaintiff's obligations to its sub-licensee under the terms of the sub-license agreement between them.

(9) The plaintiff began to supply, through its technical service unit at Spartanburg, South Carolina, the defendant Textured Fibres, Inc., with technical advice prior to but in anticipation of the execution of the sub-license agreement with it.[9] When such defendant commenced work under the patented process, it encountered, for instance, "the problem of yarn flutter". In assisting such defendant with that problem, the plaintiff performed certain tests at its Spartanburg, South Carolina, laboratory and made recommendations which apparently corrected the difficulty. The plaintiff, also, furnished extensive technical advice and assistance to such defendant in its "start-up" with the patented process. While much of this was performed at the defendant's plant, some of it involved tests at either the plaintiff's laboratory or at Abbeville Mills in Abbe-ville, South Carolina.[10] Thereafter, the record shows that this defendant requested repeatedly of the plaintiff at its headquarters in Spartanburg, South Carolina, technical advice and testing services,[11] all of which were promptly furnished by plaintiff. When this defendant thus considered new products, it sought "opportunity to explore (with the plaintiff) how we (the said defendant) can put these techniques or developments into commercial production." [12] Again, in the middle of June, 1965, the plaintiff, at the request of this defendant, made a large number of tests at its Textile Testing Department in its laboratory at Spartanburg, South Carolina, of materials the said defendant wished to use in connection with the FT process and provided the results to such defendant.[13] As late as July, 1966, this defendant was having the plaintiff test yarn for it at its laboratory in Spartanburg, South Carolina,[14] and technical services were being furnished in December of that year.[15]

In at least one instance shown by the record, (i. e., that involving Abbeville Mills) the defendant Textured Fibres, Inc., requested considerable assistance and testing by the plaintiff at its laboratory and testing facilities in Spartanburg in connection with yarn processed by it under the ARCT program and being sold by it to a customer in South Carolina.

Exhibits 25–26, September 13, 1965, to November 5, 1965,
Exhibit 28, February 8, 1966,
Exhibit 29, March 2, 1966,
Exhibits 30 and 31, March 7, 1966, and March 14, 1966, respectively,
Exhibit 35, May 19, 1966,
Exhibit 40, April 19, 1967,
(All of above Exhibits attached to Reeves Affidavit, Appellant's Main Brief and Appendix, on appeal) in addition to the Affidavits of Sawyer and Reeves, pp. 36a to 42a and pp. 77a–78a (Appellant's Main Brief and Appendix, on appeal).

9. See Exhibit 2 (Reeves Affidavit, Appellant's Main Brief and Appendix, on appeal).

10. The reason for the testing at Abbeville Mills was that Abbeville was a customer of the defendants.

11. See, Exhibits 6, 8, 10, 11, 12 and 13 (Sawyer affidavit, Appellant's Main Brief and Appendix, on appeal).

12. See, Exhibit 14 (Sawyer affidavit, Appellant's Main Brief and Appendix, on appeal).

13. See, Exhibits on pp. 68a to 75a, Appellant's Main Brief and Appendix, on appeal.

14. See, Exhibits 36 and 38 (Reeves affidavit, Appellant's Main Brief and Appendix, on appeal).

15. See, Exhibit 39 (Reeves affidavit, Appellant's Main Brief and Appendix, on appeal).

For none of these technical services and tests did the plaintiff make any charge against the defendant Textured Fibres, Inc.; and the dealings between the parties, as evidenced by the written record in this case, showed clearly that the services rendered such defendant by the plaintiff at its Spartanburg laboratory in this connection were regarded by the parties as an integral part of the plaintiff's obligations to its sub-licensee, the defendant Textured Fibres, Inc., under the terms of the sub-license agreement between them.

(10) For several years after the execution of the sub-license agreements between the plaintiff and the defendants, it is clear there was a fairly regular flow of technical advice and assistance by letter, telephone and personal visitation from the plaintiff to the defendants. As already stated, much of such advice contemplated and involved the use of the plaintiff's testing facilities at Spartanburg, South Carolina. Some of the personal visitations were at defendants' plants and others took place at plaintiff's headquarters at Spartanburg, South Carolina. The visit of defendants' representatives to plaintiff's headquarters were, among other things, for the purpose of ascertaining the services available for the defendants as sub-licensees at such headquarters, reviewing generally the problems connected with successful use by the defendants of the patented processes, and obtaining instructions of their personnel. Thus, on November 5, 1965, there is a notation that the Executive Vice-President of the defendant Textured Fibres, Inc. had visited the laboratory of the plaintiff for a discussion of "the ARCT program" [16] and in August and September, 1964, representatives of the defendant Virginia Mills visited the headquarters of the plaintiff.[17]

(11) None of the defendants maintains offices or operates plants in South Carolina. The defendant Textured Fibres, Inc. does have an agent-salesman who, though living in North Carolina, does from time to time call on customers of such defendant in South Carolina and seeks orders from them. These orders are transmitted to the headquarters of Textured Fibres, Inc. in North Carolina, where they must be approved and filled. Orders so accepted are met by shipments made from the defendant's plants in North Carolina and via common carrier and payments therefor are made direct to such defendant at its offices in North Carolina. The defendant Throwing Corporation of America, in turn, makes all its sales through its co-defendant Textured Fibres, Inc. One of the customers of the defendant Textured Fibres, Inc. in South Carolina was Abbeville Mills, which purchased yarn processed by the said defendant under the FT patents.

(12) As required under their contracts, the defendants regularly reported their production and made monthly payments to the plaintiff for several years up to the commencement of this action. However, a dispute arose between the plaintiff and the defendants over the amount of royalty payments due plaintiff under the sub-license agreements. The plaintiff contended that the defendants had underpaid their agreed monthly royalties as reported between January 1, 1966, and March 31, 1968, by $45,691.45. The defendants, in turn, denied that they had failed to report accurately or to make proper monthly payments to the plaintiff. To resolve this dispute, plaintiff accordingly brought this action to recover what it claimed were the monthly underpayments due it by the defendants.

The defendants have moved under Rule 12(b), Federal Rules of Civil Procedure (28 U.S.C.), to quash service of process upon them, made in North Carolina pursuant to the terms of the South Carolina "Long-Arm" statute, Sections

---

16. Exhibit 27, (Reeves affidavit, Appellant's Main Brief and Appendix, on appeal.)

17. Exhibits 1 and 11, (Sawyer affidavit, Appellant's Main Brief and Appendix, on appeal.)

10.2–801–809, Code of South Carolina (1962), as amended. The motion was granted by the District Court but was reversed on appeal. In so reversing, the Circuit Court remanded with directions to the District Court to make answers to the three questions, stated *supra*.

On the basis of the foregoing Findings of Fact, I conclude by way of answers to the questions propounded by the mandate of the Circuit Court of Appeals:

### (I)

*The contracts between the plaintiff and the defendants were to be performed "in part" in South Carolina within the meaning of Section 10.2–803(1) (g), Code of South Carolina of 1962, as amended.*

It is true, as defendants argue, that the contracts in question dealt with the use of certain patented manufacturing processes, performable on machines purchaseable exclusively from a French manufacturer and to be used in defendants' plants in the State of North Carolina. But this was not all of the contract. The contract, for instance, imposed a duty on the part of the plaintiff to furnish technical information and "know-how" necessary to enable the defendants to utilize the patented processes and to provide them with any additional technical information connected with the use of such patents that the plaintiff might subsequently develop in its laboratory and testing facilities. This was no inconsequential provision in the contract. To enable it to comply with such provision, the plaintiff employed scientists and engineers at its laboratory in Spartanburg. Nor did the defendants overlook or disregard the provision. Repeatedly, they called on the technical services of the plaintiff for assistance in the use of the patents. The plaintiff made no charge for such services nor did the defendants make any offer to pay. It is obvious that the one thought it was obligated to render such services under its sub-license contract and the other that it had the right under the sublicense contract to receive such service. Certainly, if there had been no contract between the parties, the defendants would not have requested, nor would the plaintiff have rendered, such services. And all parties knew and contemplated that such services under the agreements would be largely performed by the plaintiff's employees at its laboratory and testing facilities in Spartanburg, South Carolina.

The defendants suggest that these services by the plaintiff must be deemed as mere accommodations, gratuitously provided without any obligation, by the plaintiff. They base this argument upon the fact that the obligation of the plaintiff was to provide such technical services and "know-how as is necessary in DMRC's opinion to enable" the defendants "to practice the inventions licensed hereby" and such additional information as has "in DMRC's judgment been successfully reduced to practice in commercial production". These provisions, limiting the services to the exercise of plaintiff's "judgment" or "opinion", they assert, render the whole provision illusory and reduce the obligation of the plaintiff to a nullity. I do not agree.

Implicit in every contract is the requirement of good faith. Commercial Credit Corp. v. Nelson Motors, Inc. (1966) 247 S.C. 360, 367, 147 S.E. 2d 481; 17 Am.Juris.2d, sec. 256, pp. 653–4; Section 10.1–203, Uniform Commercial Code, Code of South Carolina, 1962, as amended. The obligation fixed upon the plaintiff by these provisions of the instant agreements was not one the plaintiff could blithely disregard or refuse to perform arbitrarily, capriciously or without reason. United Wholesalers v. A. J. Armstrong Co. (4th Cir. 1958) 251 F.2d 860, 862.[18] They

---

18. As Judge Soper phrases it in this case: "The validity of contracts which require performance by one party to the satisfaction of the other is well established because there is always the implied obligation upon the party to be satisfied that the privilege be exercised in fairness and good faith."

imposed no illusory duty on the plaintiff, to be performed or not in its "uncontrolled judgment". See E. I. Du Pont De Nemours Powder Co. v. Schlottman (2nd Cir. 1914) 218 F. 353, 354, cert. den. 235 U.S. 705, 35 S.Ct. 282, 59 L.Ed. 434. The plaintiff's "judgment" with reference to improved techniques, as well as its "opinion" of the necessity of technical assistance in connection with the utilization of the patents by the sublicensees, had to be reached by the "exercise of an honest judgment in good faith" (Corbin on Contracts, vol. 3A, sec. 644, p. 84) and had to be formed "within the limitations of common sense and reason and justice" (Thompson v. Insurance Company (1902) 63 S.C. 290, 293, 41 S.E. 464, 465).[19] This contractual provision is analogous to those contractual terms which condition one party's obligation on an unilateral determination by it that performance by the other party is satisfactory. Except where an element of personal taste or convenience is involved, the rule in South Carolina is well established that such contractual provisions give one no right to exercise such choice arbitrarily but one's judgment must be "based upon reasonable grounds". Singleton v. Cuttino (1916) 105 S.C. 44, 50, 89 S.E. 385; Philadelphia Storage Battery Co. v. Mutual Tire Stores (1931) 161 S.C. 487, 492, 159 S.E. 825; Patterson v. Alabama Vermiculite Corporation (D.C.S.C. 1957) 149 F.Supp. 548, 556–558.[20] Thus, where an insurer conditions the right of reinstatement of a policy on evidence of insurability "satisfactory to the insurer", it has been held that such right of the insurer must be exercised "honestly and justly, and in accordance with the principles of reason and common sense." Thompson v. Insurance Co., *supra*, p. 294 of 63 S.C., at p. 465 of 41 S.E. Likewise, a manufacturer's obligation under its warranty to replace only such parts as it "acknowledged * * * to be defective" gives the manufacturer no right to use what the Court describes as its "uncontrolled judgment" but requires performance of the warranty in good faith and with reason. Cannon v. Pulliam Motor Co. (1956) 230 S.C. 131, 137, 94 S.E.2d 397. See, also, Commercial Credit Corp. v. Nelson Motors, Inc., *supra*, at p. 368 of 247 S.C., 147 S.E.2d 481.

It is to be noted, further, that the defendants' only obligation to be performed under the sub-license agreements was the monthly accounting and payment of the royalty to the plaintiff. It was an event required to take place each month of the contract's life. It constituted the consideration for plaintiff's grant

19. Cf. language of Justice Holmes in Williams Mfg. Co. v. Standard Brass Co. (1899) 173 Mass. 356, 53 N.E. 862, 863: "We have assumed without discussion that the defendant was bound to good faith in *deciding and in expressing its* decision, and that such an arrangement limited its absolute freedom to do as it chose sufficiently to be entitled to the name of a contract."

20. This is in accordance with the general rule, as stated in 17 Am.Juris. 2d, sec. 366, p. 808. See, Williston on Contracts (3d ed., 1961), sec. 675A: "It has been questioned whether an agreement in which the promise of one party is conditional on his own or the other party's satisfaction contains the elements of a contract—whether the agreement is not illusory in character because conditioned upon the whim or caprice of the party to be satisfied. Since, however, such a promise is generally considered as requiring a performance which shall be satisfactory to him in the exercise of an honest judgment, such contracts have been almost universally upheld." For specific instances of the application of this rule to various types of agreements, see, 167 A.L.R. 411 (sale of lands), 44 A.L.R.2d 1114 (construction contracts), 47 A.L.R.2d 455 (land titles), and 86 A.L.R.2d 200 (sale of goods). Tow v. Miners Memorial Hospital Association, Inc. (4th Cir. 1962) 305 F.2d 73, applied West Virginia law, which is contrary to the general rule. See Note 14, sec. 366, 17 Am.Juris.2d, p. 808. So far as Bethea v. Railroad Company (1876) 26 S.C. 91, 1 S.E. 372, contains expressions to the contrary, such expressions were expressly disapproved in Thompson v. Insurance Co., *supra*, at p. 299 of 63 S.C., 41 S.E. 464.

of a license. The place of performance of this part of the contracts by the defendants was deemed significant in fixing jurisdiction over these actions under the South Carolina "Long-Arm" statute in the earlier decision of our Circuit Court of Appeals. See 415 F.2d 875, 877, note 4. The issue posed by the mandate is where this part of the contracts was to be performed.

■■ The general rule is that place of payment of a debt, or contractual obligation, absent clear agreement to the contrary, is the residence or headquarters of the creditor. Empire Trust Co. v. Panola Cotton Mill (1929) 149 S.C. 8, 11, 146 S.E. 612; Davis v. Cook Bros. Truck & Equipment Co. (1959) 175 Cal. App.2d 667, 346 P.2d 890, 891; Consolidated Engineering Co. v. Feikin (1947) 188 Md. 420, 52 A.2d 913, 916–917. This rule was applied in determining venue under a state statute in Staples v. Left Fork Fuel Co. (1953) 138 W.Va. 819, 77 S.E.2d 872, and Iacuone v. Pietranton (1953) 138 W.Va. 776, 77 S.E.2d 884. In those cases, the issue was the proper venue of the actions upon a contractual debt. Venue, under the West Virginia statute, turned on where the cause of action arose. That, in turn, was resolved by the Court by determining the place where payment of the debt was to be made under the contract. It was held, absent some express provision in the contract to the contrary, that the place of payment in both cases was the offices of the creditor and the breach of contract, arising from the failure to make payment as agreed, occurred in the county where such offices were located. Accordingly, venue was properly fixed in the county where payment was to be performed, i. e., in the county where the creditors' maintained their offices and residences. Following the reasoning in those cases, which accord with the general rule, it follows in this case that jurisdiction based on the place of performance as represented in the payments to be made under the license contracts would be at the headquarters of the plaintiff, to wit, Spartanburg, South Carolina. There is nothing in the contracts themselves to rebut this presumption that payments by the defendants were to be made at the headquarters of the plaintiff in Spartanburg, South Carolina. In fact, the contracts affirm that such payments were to be made at Spartanburg; they provide that such payments shall be mailed to the plaintiff's post office box in Spartanburg, South Carolina. The alleged failure of the defendants to make proper payment under the contracts thus occurred in Spartanburg, South Carolina.

■ The argument of the defendants that place of payment was in North Carolina, since payment by mail was intended by the parties and such payment occurred when the check was deposited in the mails, properly addressed and stamped, at their own residences in North Carolina, rests on the presumption, arising from such mailing, that the payment was received but this presumption of receipt does not constitute payment or change the place of performance (i. e., payment) under the contract. See 31A C.J.S. Evidence § 136, pp. 287–293; Arkansas Motor Coaches v. Commissioner of Int. Rev. (8th Cir. 1952) 198 F.2d 189, 191; Miller v. State of Oklahoma (D.C.Okl.1965) 240 F.Supp. 263, 267–268, aff. 363 F.2d 843; Government Employees Insurance Company v. Swanson (D.C. Minn.1965) 246 F.Supp. 698, 700. Such place of performance remains that of the creditor's headquarters.

■ The defendants assert finally that any conclusion that the contracts in question were to be performed "in part" in South Carolina conflicts with the opinion of the Court in Throwing Corp. of Amer. v. Deering Milliken Research Corp., supra, 302 F.Supp. 487 involving these same contracts between the parties, in which the statement is made that these contracts, "are, by their terms, to be performed wholly in North Carolina" (p. 492). Sufficeth that such statement was "wholly" unnecessary to the result in that case. The issue there was the suability of the plaintiff in North Carolina and whether the plaintiff

had, in connection with its performance under the contracts, sufficient "minimal contacts" within the State of North Carolina to render it amenable to suit in that State. Among other circumstances noted by the Court in resolving that issue were the visits of representatives of the plaintiff to the State of North Carolina made in connection with the license agreements. The issue in this case is the reverse: It involves the suability of the defendants in South Carolina and their "minimal contacts" with such State incident to performance under the license agreements. And to a degree the very same facts that persuaded the Court in the cited case to sustain North Carolina jurisdiction are present in reverse in this case in support of South Carolina jurisdiction. The record in the North Carolina case, of course, emphasized the contacts of the plaintiff with North Carolina; the record in this case focuses on the contacts of the defendants with South Carolina. The decision in the cited case is clearly right—on the record before it—in sustaining jurisdiction in North Carolina over the plaintiff. Equally clear on the record made here is South Carolina jurisdiction over the defendants. And there is nothing inconsistent in such result. It is as reasonable that the defendants' "contacts" with South Carolina in performance of these license contracts render them suable thereon in South Carolina as that the plaintiff's "contacts" with North Carolina subject it to the jurisdiction of the North Carolina courts. The contracts in question were to be performed "in part" in both North Carolina and South Carolina and jurisdiction of a controversy arising out of such contracts could be maintainable in either jurisdiction under the "Long-Arm" statutes of the respective jurisdictions.[21]

To sum up: The conclusion seems inescapable that these contracts were to be performed "in part" at least in South Carolina. As has been pointed out, the contracts did not cover merely the use of the patented process in North Carolina on machines purchased in France. Considering, as we must, all the provisions of the contracts—especially the obligation of the plaintiff to furnish technical services and assistance, an obligation which was real and not illusory—and the conduct of the parties thereunder, including the many demands of the defendants for technical service, it is clear that significant events took place in South Carolina in performance of the terms of the contracts. Indeed, as we have seen, one of the requests of the defendant Textured Fibres, Inc., under the contract for testing and technical services by the plaintiff at its Spartanburg headquarters involved products processed under the patented program and sold to a South Carolina customer of such defendant.

We have not considered whether the defendants might be deemed suable under Section 10.2-803(1) (a) on the ground that the defendants, by reason of their soliciting of business in South Carolina, were "transacting any business in this State". Such question was not embraced within those on which answers were mandated by the Court of Appeals. That such might provide a basis for jurisdiction, see Wisconsin Metal & Chemical Corp. v. DeZurik Corp. (D.C.Wis.1963) 222 F.Supp. 119, 123, and Green and White Construction Co. v. Columbus Asphalt Corp. (D.C. N.Y.1968) 293 F.Supp. 279, 280.

(II)

◼ *Jurisdiction under Section 10.2-803(1) (g) over this cause is not in-*

---

21. Even if it be considered that the Court in the cited case held that the contracts in question were to be "wholly performed" in North Carolina, and that such holding was essential to its decision (Yates v. United States (1957) 354 U.S. 298, 335–338, 77 S.Ct. 1064, 1 L.Ed.2d 1356), its order was interlocutory and did not preclude this Court, under any principle of *res judicata,* from reaching the conclusion that the contracts were to be performed "in part" in South Carolina. See Hoffman v. Blaski (1960) 363 U.S. 335, 340, 80 S.Ct. 1084, 4 L.Ed.2d 1254, note 9.

*valid under the Fourteenth Amendment to the United States Constitution.*

The South Carolina "Long-Arm" statute was intended to extend the jurisdiction of the Courts of that State as far as due process allows. Shealy v. Challenger Manufacturing Company (4th Cir. 1962) 304 F.2d 102, 107. The extension of such statute to the facts of this case does not exceed the bounds of such due process. It could be that the signing by the plaintiff of the license agreements in South Carolina, by itself, does not provide an essential basis for the exercise of South Carolina jurisdiction.[22] That payment by mail to an address in South Carolina was to be made by the defendants under the contracts, taken alone, might not suffice in meeting the constitutional mandate of due process as a basis for jurisdiction in this Court.[23] But, viewing all the circumstances together and not in isolation, giving effect to the conduct of the parties and their performance under the contracts, the conclusion seems clear that the application of Section 10.2–803(1) (g) to the facts of this case does not offend due process. Certainly, the parties had many "contacts" with this State in connection with these contracts in addition to those already cited. These "contacts" have been discussed heretofore. As has been observed, the parties to the contracts carried on considerable discussions, in person, by letter and by telephone, looking to increased use by the defendants of the patented process under the terms of the contracts. Manufacturing problems encountered by the defendants in the use of the patents were, as we have seen, taken up by them with the plaintiff and its assistance requested. Repeatedly, the plaintiff made tests at the instance of the defendants for the purpose of promoting the use of the patented process by the defendants. We have already indicated that these services were within the obligations assumed by the plaintiff under the contracts.

But even if performed gratuitously and simply because of the plaintiff's interest in assisting the defendants in the latter's use of the patented process, the situation would not be different. The technical assistance requested and rendered indisputably was connected with the subject-matter of the contracts and was intended for the pecuniary benefit of both the plaintiff and the defendants. Moreover, this assistance was not an isolated event. It was rendered systematically, over a considerable period of time. It actually involved working with a South Carolina customer of one of the defendants. Without question, there were more than the "minimal contacts" required by due process for jurisdiction over the defendants in this case. See Lamb v. Hussmann Refrigerator Co. (D.C.Or.1966) 253 F.Supp. 280, 281; Crane Company v. Federal Hydronics, Inc. (D.C.Pa.1965) 240 F.Supp. 180, 183.

(III)

■ *Section 10.2–803(1) (g) is valid under Article III, Section 17 of the Constitution of South Carolina.*

Section 17, Article III of the Constitution of South Carolina provides:

"Every Act or resolution having the force of law shall relate to but one subject, and that shall be expressed in the title."

The section upon which plaintiff bases its claim of jurisdiction was enacted as a part of the Uniform Commercial Code as adopted in this State. The title to such Code as it was enacted by the South Carolina General Assembly described the legislation as "An Act To Be Known As The Uniform Commercial Code * * * Regulating Procedure, Evidence, And Damages In Certain Court Actions Involving Such Transactions, Contracts, Or Documents * * *." It included as a part of such Code, Section 10.2–803(1) (g), regulating manner of service and determining jurisdiction

---

22. Southern Machine Company v. Mohasco Industries, Inc. (6th Cir. 1968) 401 F.2d 374, 382.

23. Franklin National Bank v. Krakow (D.C.D.C.1969) 295 F.Supp. 910, 918.

in this State "as to a cause of action arising from * * * entry into a contract to be performed in whole or in part by either party in this State".

It would seem that Section 10.2–803 (1) (g) is properly embraced in the language of the "title" of the Act of which it is a part. It is within the definition of "Procedure". Actually, method of service of process as a means of securing jurisdiction is included as an integral part of the Federal Rules of Civil Procedure (Rule 4), and is to be found in the procedural sections of the South Carolina Code (Sections 10–421 to 10–473, Code of South Carolina, 1962). It must be observed that the Constitutional provision, relied on by the defendants for invalidation of the section in question, it has been repeatedly held, is not to be given a narrow construction but is to be construed "very liberally to the end that legislation shall not thereby be needlessly hampered and embarrassed". State ex rel. Ray v. Blease (1913) 95 S.C. 403, 414, 79 S.E. 247, 252. It "is complied with when the title expresses the general subject of legislation". Gasque, Inc. v. Nates, Commissioner (1938) 191 S.C. 271, 291, 2 S.E.2d 36, 45. Measured by these standards, Section 10–2–803(1) (g) which unquestionably deals with "procedure" does not offend the requirements of Section 17, Article III of the Constitution of South Carolina and is within "the general subject" of the legislation in question.

At the same time that a hearing was had herein, pursuant to the mandate of the Circuit Court of Appeals, an alternative motion for a change of venue, made under Section 1404(a), 28 U.S.C., by the defendants, in the event that their motion to dismiss was denied, was heard. Such motion raises the question whether this forum is the appropriate, as distinguished from a permissible, forum for disposing of the issues between the parties. See Gelfand v. Tanner Motor Tours, Ltd. (2d Cir. 1967) 385 F.2d 116,

121, cert. den. 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95; Color Technique, Inc. v. Don Wallace, Inc. (D.C.Ill.1965) 241 F.Supp. 952, 954. In that connection, both parties referred to a number of suits pending in federal courts in New York, North Carolina and South Carolina in which the basic question was the validity of the patents embraced in the agreements between the plaintiff and the defendants.[24] While this issue has not yet been raised in the present case, it is accepted that, if jurisdiction in this Court is sustained, the defendants will raise that issue. At that time there will be pending in various federal courts, including this court, a substantial number of cases, in which the validity of the same patents will be the basic issue. It would seem that such a situation calls for resort to the procedure provided under Section 1407, 28 U.S.C., to deal with multi-district litigation involving a common question of law or fact. It is to be assumed that the parties to this litigation, or the parties in a related case, will properly move to invoke such Section and it would seem more appropriate to delay the determination of the motion for change of venue until the completion of discovery under such multi-district proceeding.

For the foregoing reasons the motion of the defendants to dismiss is denied and the motion for change of venue is deferred, and

It is so ordered.

I am of the opinion that there is substantial ground for difference of opinion concerning the questions involved herein. For that reason, I am of the opinion that an immediate appeal from this Order would materially advance the ultimate termination of this litigation as well as other litigation that might follow. Further proceedings in this Court are thus stayed to permit an appeal to be taken from this Order, the application for such review to be made within ten (10) days after the date of this Order.

24. It might be noted that there are also pending in Virginia additional cases involving similar agreements to those now before the Court.