The **DUPLAN CORPORATION**, Plaintiff,

v.

**DEERING MILLIKEN, INC.**, et al., Defendants.

**DEERING MILLIKEN RESEARCH CORPORATION**, Plaintiff,

v.

The **DUPLAN CORPORATION** and Burlington Industries, Inc., Defendants.

The **DUPLAN CORPORATION** et al., Plaintiffs on the Counterclaim,

v.

**DEERING MILLIKEN RESEARCH CORPORATION**, Defendant on the Counterclaim,

and

Deering Milliken, Inc., et al., Additional Defendants on the Counterclaim.

Civ. A. Nos. 71–306, 70–968, 69–1096, 68–705, 70–14, 70–250, 70–358, 70–386, 70–493, 70–628, 70–683, 71–88, 71–90, 71–92, 71–94, 71–96, 71–98, 71–100, 71–102, 71–126, 69–777, 70–189, 70–295, 70–385, 70–391, 70–622, 70–677, 71–87, 71–89, 71–91, 71–93, 71–95, 71–97, 71–99, 71–101, 71–115, 71–127, and 71–283.

United States District Court, D. South Carolina, Spartanburg Division.

Oct. 18, 1971.

See also D.C. 320 F.Supp. 806.

Thomas A. Evins, Butler, Means, Evins & Browne, Spartanburg, S. C., Jay Greenfield, Simon Rifkind and David Brody, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Deering Milliken, Inc., and Deering Milliken Research Corp.

William M. Cooper, Spartanburg, S. C., Joseph W. Burns, of Burns, Van Kirk, Jube & Kafer, New York City, for Moulinage et Retorderie de Chavanoz.

Rufus M. Ward, Ward, Howell & Barnes, Spartanburg, S. C., Granville A. Brumbaugh, of Brumbaugh, Graves, Donohue & Raymond, New York City, for Ateliers Roannais de Constructions Textiles, (ARCT, France)

R. Hoke Robinson, Thomas T. Moore, Robinson, McFadden & Moore, Columbia, S. C., Arthur O. Cooke, Cooke & Cooke, Greensboro, N. C., for ARCT, Inc.

W. Francis Marion, O. G. Calhoun, Jr., Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., John Malley, Wm. K. West, Jr., of Cushman, Darby & Cushman, Washington, D. C., for Burlington Industries, Inc., Madison Throwing Company, Inc., Leon-Ferenbach, Inc. National Spinning Co., Inc.

Fletcher C. Mann, Leatherwood, Walker, Todd & Mann, Greenville, S. C., Charles B. Park, III, of Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., for United Merchants & Manufacturing Inc.

Fletcher C. Mann, Leatherwood, Walker Todd & Mann, Greenville, S. C., Charles B. Park, III, Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., Anthony F. Phillips, Willkie, Farr & Gallagher, New York City, for The Duplan Corp., The Schwarzenbach-Huber Co., Jonathan Logan, Inc., Frank Ix & Sons Va., Corp., Lawrence Texturing Corp. and Burkyarns, Inc.

Edward P. Perrin, Perrin, Perrin & Mann, Spartanburg, S. C., David Rabin, McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Dixie Yarns, Inc., Tex-Elastic Corp., Hemmerich Industries, Spring-Tex, Inc., Olympia Mills, Textured Fibres, Virginia Mills, Inc., and Throwing Corp. of America.

## ORDER

HEMPHILL, District Judge.

Motions to dismiss for lack of jurisdiction by defendants Moulinage et Retorderie de Chavanoz (referred to hereinafter as "Chavanoz") and Ateliers Roannais de Construction Textiles (referred to hereinafter as "ARCT-France") invite decision in this forum. The issue projected is whether, under the facts displayed before this court the South Carolina contacts of Chavanoz and ARTC-France are of such sufficiency in kind and extent, such quality and nature, to give this court that *in personam* jurisdiction to allow plaintiff Duplan Corporation, et al, and certain defendants, to proceed against them in the United States District Court for the District of South Carolina. This issue immediately focuses attention on the application of South Carolina's "long arm" statutes [1], and hopeful reconciliation of those statutes with the constitutional considerations propounded by the United States Supreme Court and courts of appellate jurisdiction.

Initially, this litigation was instituted by Deering Milliken Research Corporation (referred to hereinafter as DMRC) to collect moneys allegedly due from Textured Fibres, Inc., and others, for payments due under licensing agreements between DMRC and those licensees, known as "throwsters". The litigation has been subject of considerable judicial treatment. See Textured Fibres, Inc. v. Deering Milliken Research Corp. (D.C. S.C.1969) 302 F.Supp. 487, reversed 415 F.2d 875 (4th Cir. 1969) reviewed (D.C. 1970) 310 F.Supp. 491; Throwing Corp. of America v. Deering Milliken Research Corp. (D.C.1969), 302 F.Supp. 487; Leesona Corp. v. Cotwool Mfg. Corp., Judson Mills Div. (4th Cir. 1962), 308 F.2d 895. These cases involve some 21 patents owned by one or the other of two French corporations which are contesting jurisdiction of this Court: Chavanoz [2] and Arct-France. After the institution of the suit by DMRC, various other litigations were pitched, all of which have now been consolidated, with venue in the District of South Carolina.

At the outset of the litigation at least one of the patents was registered in the name of ARCT-France and the remainder in Chavanoz. It is alleged now that ownership of all the patents is in Chavanoz. Be that as it may, about half of the total group of patents originated on applications of Henri Crouzet or Charles Crouzet, principal officers of ARCT-France, and it is the contention of Duplan, et al, the plaintiffs, that they were subsequently assigned to Chavanoz as a part of a master plan to exploit the patents, in the United States and particularly in South Carolina. This plan was developed, perfected, and carried out over a period of years.

With this background, and on the basis of the record presented by the

---

1. S.C.Code Anno. § 10.2–802 (1966) states:
   A court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, doing business, or maintaining his or its principal place of business in, this State as to any cause of action.
   S.C.Code Anno. § 10.2–803 states:
   (1) A court may exercise personal jurisdiction over a person who acts directly or by an agent as to a cause of action arising from the person's

(a) transacting any business in this State;
   *     *     *     *     *
   (g) entry into a contract to be performed in whole or in part by either party in this State.

2. At pre-trial DMRC, through counsel, announced it would not participate in, or argue, these issues of jurisdiction.

parties at this stage of the proceedings, this court publishes its

## FINDINGS OF FACT
### —THE PARTIES—

1. Chavanoz is Moulinage et Retorderie de Chavanoz, a French corporation with its principal place of business at Chavanoz, France. It is engaged in owning and licensing patents and collecting royalties on these patents on a world-wide basis.

2. ARCT-France is Ateliers Roannais de Construction Textiles, a French corporation with its principal place of business at Roanne, France. It manufactures and sells ARCT yarn texturing machines, sometimes called FT machines. Its principal officers, Henri Crouzet and Charles Crouzet, allegedly originated many of the FT patents involved in this litigation. These were conveyed to Chavanoz who granted ARCT-France the exclusive rights to manufacture and sell the FT machines throughout the world. The several ARCT-France contracts, which require performance in and affect South Carolina have been reviewed by the court in the posture of exhibits. They form a basic part of the structure of the plan for marketing the ARCT machines and imposing tribute on their future operation.

3. The Duplan Corporation, Jonathan Logan, Inc., and the other yarn "throwsters" are the purchasers of these ARCT machines and are the plaintiffs in these actions asserting that the court has jurisdiction over Chavanoz and ARCT-France.

4. DMRC is Deering Milliken Research Corporation, a wholly-owned subsidiary of Deering Milliken, Inc. (DMI), and is a South Carolina patent holding and licensing corporation with its principal place of business in Spartanburg, South Carolina. It has entered into a series of contracts with Chavanoz and also with ARCT-France requiring performance in South Carolina. Copies of the contracts have been reviewed as exhibits. Chavanoz made DMRC its agent for (1) regularly procuring United States patents for the French owners, (2) policing the machines in this country so as to make certain that the purchasers signed up to pay the royalties, (3) collecting the royalties, (4) remitting the royalties (more than a million dollars a year) from South Carolina to France, (5) collecting additional know-how from the experience here in this field and transmitting such know-how to the French concerns, and (6) demonstrating the use of the machines in South Carolina for the customers.

5. ARCT, Inc. is a subsidiary of ARCT-France, established by it at the beginning of 1966 as sales and service agency in North America. It is a North Carolina corporation with its principal office at Greensboro, and is regularly active in business in South Carolina. Henri Crouzet, president of ARCT-France, is also president of ARCT, Inc. and a director of both. Charles Crouzet, the "directeur generale" and vice president of ARCT-France, is also a director of ARCT, Inc.

6. Before 1966, ARCT-France sold and serviced its machines in the United States through Whitin Machine Works of Massachusetts. Whitin is mentioned here because it was a party to some of the basic contracts between Chavanoz, ARCT-France and others.

7. Another party to some of the basic contracts is Leesona Corporation of Warwick, Rhode Island. It is the only American manufacturer of competing machinery. It acquired from a partnership of alleged inventors (The Permatwist Company) certain other United States patents on the competing machinery.

8. Leo Soep, a French resident and a director of ARCT, Inc., negotiated many times on behalf of ARCT-France, Chavanoz, and both of them in South Carolina and elsewhere in the United States on licensing the use of ARCT machines here. He is or has been an agent or employee of both French defendants and sometimes is said to be an employee of

CTA, a French corporation which is an affiliate of Chavanoz.

9. Norman C. Armitage, a Spartanburg resident and vice president of DMRC and DMI, negotiated the original and subsequent agreements with Chavanoz and ARCT-France and pursuant to them supervised the licensing of ARCT machines in this country. His diary entries refer to meetings in South Carolina (and elsewhere) with Chavanoz and ARCT-France representatives. The references in his diary to Milliken mean Roger Milliken, to Rhone Poulenc mean a French industrial concern of which Chavanoz is a subsidiary, to Conrad mean Robert Conrad, a lawyer who represents Leesona in connection with its patents and their litigation and who also, at the outset of some of these cases, represented DMRC. Armitage testified Conrad represented Chavanöz and ARCT in his meeting with Armitage.

## THE CONTRACTS

10. The structure of the sales and licensing program for ARCT machines is embodied in a series of at least 25 contracts. The basic agreements between Chavanoz and ARCT-France are dated October 30, 1954, and July 18, 1962. These are Exhibits 1 and 9. They obligate ARCT-France, in return for exclusive world-wide rights to manufacture and sell the machines, to assign all improvements to Chavanoz and to deliver machines only to persons or firms who have entered into a license agreement to pay royalties on the use of the machines.

11. On February 20, 1959, ARCT-France in carrying out its agreement with Chavanoz, entered into a contract with Whitin Machine Works of Massachusetts for the sales and service of ARCT machines in the United States, Canada, and Mexico. Whitin agreed not to sell the machines to any person or firm not approved by Chavanoz or DMRC.

12. In December 31, 1957, Chavanoz entered into the first of at least eleven contracts with DMRC relating to the ARCT machines. These contracts, made in South Carolina, granted DMRC the exclusive agency in the United States, Canada, and Mexico to license others to use the ARCT machines. They contemplate DMRC will police the use of the machines, collect the royalties, deduct the expenses and remit one-half the royalties to Chavanoz. Under these contracts Chavanoz shall direct ARCT-France "to sell or deliver FT machines in the United States and Canada and Mexico only to parties sub-licensed by DMRC." DMRC is obligated to assign all improvements to Chavanoz, to receive from Chavanoz improvements and other technology from France and to file and prosecute applications for United States patents relating to the FT machines. The title to each patent goes to Chavanoz. The royalty funds are collected in Spartanburg, South Carolina, expenses paid, and at periodic intervals one-half is remitted to Chavanoz from the special account maintained in Spartanburg. Chavanoz and DMRC are committed to police the patents and Chavanoz must approve of the commencement of litigation and share its costs. In addition:

(a) Chavanoz requires DMRC to maintain technical personnel to assist sub-licensees (many of these licensees are in South Carolina and DMRC personnel are maintained in South Carolina);

(b) Chavanoz and DMRC exchange technical personnel (in South Carolina);

(c) Chavanoz controls the terms of agreements between DMRC and sub-licensees (including those in South Carolina);

(d) Chavanoz and DMRC cooperate and bear equally the cost of infringement actions;

(e) Chavanoz undertakes to defend sub-licensees;

(f) Chavanoz may succeed DMRC and deal directly with sub-licensees.

Armitage testified that Chavanoz participated in and approved of the institution of the various action by DMRC now before the court and shares their expense.

13. Appendix B is a diagram of the way all these alleged patent rights were pooled and then exploited by ARCT-France and Chavanoz acting in concert. Down one route the machines were made and sold to the throwsters. Down the other route the throwsters were required to pay continuous tribute to France on every pound of yarn run on the machines. Thus, substantial benefits flowed via both routes to these French corporate defendants.

14. On May 27, 1963, ARCT-France made a contract with DMRC for the rental of certain ARCT machines in Spartanburg which are owned by ARCT-France. This contract was superseded September 1, 1966, by another rental agreement. These machines, property of the defendant ARCT-France, are still located in Spartanburg and continue to be operated here and payment made from South Carolina to ARCT-France for their operation.

15. On October 21, 1967, ARCT-France made a contract with DMRC in South Carolina regulating the royalty rates and manner of payment on sales of ARCT machines in Mexico. Pursuant to this contract ARCT-France collects from the customers in Mexico and remits a portion of their payments to DMRC in Spartanburg. This is in lieu of royalties and means that the machines in Mexico, once paid for, can be operated there free of the continuing royalty demanded of United States throwsters.

16. Beyond all these contracts, and beyond the regular systematic coordinated performance in South Carolina of these basic agreements between Chavanoz, ARCT-France, and the American agent in South Carolina—on March 31, 1964, the defendants ARCT-France and Chavanoz together with DMRC and Whitin Machine Works entered into a patent exploitation treaty with the only American manufacturer of competing machinery,

Leesona Corporation. This treaty of March 31, 1964, terminated vigorous litigation then pending simultaneously in South Carolina and Massachusetts, and guaranteed forever after that the parties would not attack each other while they both asserted their patent claims against the throwsters in this country. Thus, litigation which might have determined the validity and enforceability of some of these patents as early as 1964 was abated.

SALE AND PURCHASE PLAN

17. The basic contracts by which Chavanoz and ARCT-France established the structure for licensing the use of ARCT machines in the United States and in South Carolina are the contracts which have been described above. It is clear that Chavanoz and ARCT-France agreed that none of the machines would be sold or delivered to throwsters in the United States who did not take a license to pay royalties on the use of the machines. The South Carolina agent DMRC carrying out the basic contracts among and with the French concerns dutifully established a network of licenses with yarn manufacturers (the throwsters). For instance, Armitage wrote to the predecessor of Reliable (one of the parties here) on September 4, 1963, after receiving a copy of the signed license agreement for the payment of royalties on machines ordered from ARCT-France through Whitin:

"We are writing Whitin Machine Works that you are now a licensee and that it is in order for them to make delivery of the machines upon which you placed orders with them."

Exhibit 27 is a letter of July 2, 1964, from Waters, manager of ARCT machinery and sales for Whitin to a prospective purchaser:

"I have already advised you that purchasers of this equipment are required to sign a use license with Deering Milliken Research Corporation, Spartanburg, South Carolina. I have notified Dr. Norman Armitage of your purchase and he will shortly send

a copy of the use license to you for approval and signature."

Exhibit 28 dated January 28, 1968, is a letter from W. M. Manning of DMRC to Robert F. Waters, ARCT, Inc.:

"Lawrence Texturing Corporation is now licensed by DMRC to manufacture crimp synthetic yarn by application of a false twist according to the Chavanoz patents. Accordingly, you are now free to deliver the ARCT machines that Lawrence Texturing has ordered."

18. The set-up whereby these ARCT machines could not be sold to the throwsters unless they purchased a license from DMRC is described by Judge Haynsworth in Leesona Corp. v. Cotwool Mft. Corp., DMRC, et al, supra [898]:

"This is based upon the fact that Deering Milliken has an exclusive license from the French manufacturer of the 'FT' machines [same machines as in suit here] to sublicense their use in the United States. There is no agreement between Whitin and Deering Milliken, but because of Deering Milliken's use license, Whitin may not sell the machines to a prospective purchaser unless the purchaser has been licensed by Deering Milliken to use them."

### French Erectors, From ARCT-France, Install Machines in South Carolina

These machines are bulky and have frequently been shipped from ARCT-France as a group of barrels or boxes containing parts. Employees of ARCT-France have come to South Carolina and elsewhere in the United States to assemble the machines on the spot in the plant of the throwster who is purchasing the machines. Waters testified that in the two years preceding his deposition the sale of machines to customers in South Carolina exceeded one million dollars and that it was necessary on occasion to have French employees of ARCT-France come to South Carolina to assemble and install these machines in the customers' plants. They are employees of ARCT-France.[3] This is a continuation program of insulation and service which ARCT-France carried on through Whitin in the years before it established its own direct subsidiary ARCT, Inc. at Greensboro.

### Royalties

19. The American agent DMRC collects the royalties at Spartanburg, South Carolina, and, after payment of expenses, remits half of the royalties to Chavanoz. Chavanoz at all times had had a substantial interest in the royalties located in South Carolina. The money flows to Chavanoz from Spartanburg on a regular and continuous basis. More than 700 of these machines have been sold to throwsters in the United States. Deering Milliken, Inc., alone operates many of these machines in South Carolina. The throwster plaintiffs here operate a number of these machines in South Carolina. At the oral argument, counsel for Chavanoz said DMRC knew the amount of royalties paid by South Carolina throwsters and, after some colloquy with counsel for DMRC, counsel for Chavanoz stipulated "that a substantial amount came from South Carolina."[4]

### Exchange of Research and Know-how

20. Under the basic contracts, know-how is collected in Spartanburg, South Carolina, at DMRC, and forwarded to France. In turn, French know-how is forwarded to South Carolina to DMRC at Spartanburg. ARCT-France also supplies manuals and technical instructions and maintains machines at Spartanburg, South Carolina, at DMRC. In addition, Exhibits 29[5] through 36 illus-

---

3. Waters deposition, page 97, see also pages 24, 30, and 36.

4. Pages 104, 105, Pre-trial record of August 18, 1971.

5. Exhibit No. 29 is a letter from ARTC-France to DMRC, dated February 7, 1964, relating to regulating the machine. Exhibit No. 30, same routine describes

trate the exchange in writing and in person of information between ARCT-France and DMRC at Spartanburg. This correspondence refers to visits back and forth and to exhibition of the ARCT machines in the United States. In Exhibit 31, Crouzet on behalf of ARCT-France wrote Armitage in regard to Bob Reeves of DMRC Spartanburg:

> "I would suggest that he work with our specialists who are going quite often to the States, and get practice with them."

21. Exhibit 18 [6] refers to the warranties of ARCT-France and the machine sales agreements also contain warranties as to installation and parts running from ARCT-France to the throwster purchaser in the United States. These would include of course the machines installed in South Carolina.

### ARCT-France and Chavanoz Personnel in South Carolina

22. In addition to testimony and diary entries of Norman Armitage and the many contracts between the parties which demonstrate the long, regular, and continuous communication between them, Exhibits before the court further illustrate the telephone and written communications flowing regularly between them and having one end of this exchange clearly located in South Carolina. Exhibit 38 refers specifically to Mr. Moutet of ARCT-France being at the mill of a South Carolina customer for these machines at Union, South Carolina. And further work was done by Moutet at Spartanburg. Exhibit 39 is a letter from Roger Milliken to Henri Crouzet, president of ARCT-France, in regard to their assistance in helping solve "our problem," of talks then in progress with Norman Armitage and of ARCT-France's decision to ship two

machines per month, presumably to DMI in South Carolina.

### Property Located in South Carolina

23. Exhibits 12 and 19 [7] deal with the machines which are the property of ARCT-France, located in South Carolina and operated there for the past eight years. Exhibits 40 through 46 are correspondence and invoices of ARCT-France in relation to this equipment and the rental of it in South Carolina. In addition, Chavanoz has its very substantial and continuing interest not only in the royalties collected for its account in Spartanburg, South Carolina, but also in the many sub-license agreements which its agent DMRC holds in Spartanburg and the so-called patent rights, pending patent applications, patents and "know-how" collected and accumulated by DMRC for it in South Carolina.

### New Patents

24. The contracts, the continuing operation by DMRC in South Carolina of a patent procurement business, generating patents the ownership of which always goes to the defendant Chavanoz and which are regularly funneled into the licensing program as additions to the throwsters' licenses. Entry No. 29 in the Armitage diary refers to a new oath being arranged to be made by Crouzet of ARCT-France on an application for the issuance of a patent which ultimately ended up in the ownership of Chavanoz.

Over the years as a new patent issued, it was assigned to Chavanoz; and DMRC would thereupon notify the licensee: "Just add this new patent as an Appendix to your license and you are bound by it under the same terms." Thus, the rental derived from the operation of these machines and flowing back to France could go on for many years.

---

improvements. Exhibit No. 31 through 36 evidence correspondence and confidence as to technical improvements.
(All exhibits referred to have been filed with the court as bearing on jurisdiction.)

6. Letters of agreement concerning rental of the machines by DMRC.

7. This is the agreement between ARCT-France and ARTC-America and contemplates extensive business in the United States.

### Litigation Control

25. Chavanoz exercised a measure of control of litigation in the United States including, of course, South Carolina. Armitage testified that Chavanoz authorized and approved DMRC's bringing those cases which are now before the court.[8] Exhibits 47 through 49 [9] illustrate the way in which the defense of one throwster in the operation of the ARCT machines was assumed by DMRC. It was acting for Chavanoz and Chavanoz personnel visited Greensboro in connection with the case.[10] In the language of Mr. Armitage, Exhibit 49, "we shall be taking over the control of the case and putting it in the hands of Mr. Conrad * * *."

### ARCT, Inc. is the Agent of ARCT-France (?)

26. Opponents urge on this court a finding that ARCT, Inc. is the agent of ARCT-France. Both parent, of France, and subsidiary violently deny and seek to bolster the denial by the contracts before the court. Initially ARCT-France contends that the agreement of February 7, 1966, specifically preserves the independence of ARCT, Inc., despite the sixty per cent (60%) ownership of the stock of the latter by the former. Certain language of this [11] and other writings [12] belie such conclusion. For instance, in the contract, among other provisions:

> ARCT-America will maintain a complete and accurate record of all parts and components in the *consigned* inventory and will provide ARCT-France with a semi-annual inventory report listing all such parts and components. [emphasis added]

> Within 15 days of the end of each calendar month ARCT-America will send ARCT-France a list of the parts and components sold to customers during such month * * *.

> ARCT-France will use its best efforts to provide ARCT-America from time to time as may jointly be determined to be required, with

> (a) use of its facilities and skilled personnel for research * * *;

> (b) use of any patent or patent rights owned by or in which ARCT-France has a patentable interest;

> (c) skilled personnel * * *;

> ARCT-France may from time request ARCT-America to carry out specific projects or activities not involving the sale of machinery by ARCT-America * * *.

> All inventories developel by ARCT-America * * * shall be assigned to ARCT-France

The agreements and correspondence illustrate how ARCT-France set up its direct subsidiary in the United States to handle the sale and servicing of ARCT machines. Exhibit 52 is a letter from ARCT-France by its president, Henri Crouzet, to Norman Armitage at Spartanburg, South Carolina. Speaking for ARCT-France, its president says:

> "Today, we are ourselves established at Greensboro, * * * * " [13]

Exhibit 51 is a letter from ARCT, Inc. to Lawrence Texturing Corporation, one of the throwsters in the cases before the court. Note that the printed letterhead shows Henri Crouzet—ARCT-France, President, and carries the legend "Subsidiary of Ateliers Roannais de Construction Textiles, Roanne, Loire France."

■■ Exhibit 52 is a brochure distributed here by ARCT-France and ARCT, Inc. and carries the insignia or logo of both, with ARCT-France clearly dominant. In other publications of

---

8. Armitage Deposition, page 168.

9. Suit by Macasta Corporation against Burlington Industries involving use of F. T. processes on techniques and procedures which DMRC had recommended.

10. Armitage Deposition, page 51.

11. Before the Court as Exhibit No. 18.

12. Exhibits No. 19, 50, 51 and 52.

13. "Aujourd'hui, nous sommes implantés nous-memes a Greensboro * * * * "

ARCT-France, ARCT, Inc. is referred to as its "direct subsidiary" and as its "North American Headquarters." In view of the identity of the president and some of the other officers and directors and the controlling stock interest of the parent corporation and the fact that selling and servicing the ARCT machines is the only business of ARCT, Inc., it is obvious that ARCT, Inc. is a conduit for ARCT-France. It is admittedly in South Carolina on a continuous and regular basis and has been served as agent for ARCT-France. That should be sufficient. In addition, in many of these cases Mr. Crouzet himself, the president of ARCT-France, was here and has been served in person by the United States Marshal at Greensboro when he arrived there on the ARCT plane coming from Spartanburg, South Carolina, where he had attended the business of ARCT-France. In oral argument, it was contended that he had several hats and that he wasn't served with the right hat on. He may have several hats but he's only one person with one head and the business of ARCT-France is his primary business and that was what he was here about and these suits arise out of that business and service upon him personally is also sufficient.

In the light of these contacts it is unnecessary to bring ARCT, Inc. within the definition of agency as the term is ordinarily used, with the ordinary and usual test of control of the agent by the principal. Suffice it to note that the facts reveal an active and subservient subsidiary, intent on the American business of the parent, directly and indirectly.

### Basic Plan

The basic plan is revealed in the contacts and activities hereinabove described, the successive contracts between Chavanoz and ARTC-France and others, commencing years ago and in effect today with expectations of continuing in the future. The contracts imposed reciprocal obligations upon ARCT-France and Chavanoz in respect to how the alleged inventions and patents were to be worked. These contracts contemplated performance, and performance has taken place, in South Carolina and in various ways directly affecting South Carolina, with full knowledge and intent of ARCT-France and Chavanoz that performance would have substantial effects in South Carolina and on the South Carolina textile industry.

Pursuant to these contracts, F. T. machines were made in France by ARCT-France for shipment to and erection by its French employees in South Carolina.[14] The purchasers of these machines are Duplan and other "throwsters", who use the machines in South Carolina. The use of these ARCT machines by the plaintiff throwsters is the subject of these suits. In addition to the sales price for the machines, the purchasers were required to execute use licenses and pay royalties based on the subsequent operation of the machines, which royalties were collected in South Carolina and remitted to Chavanoz.

Certain other machines, the property of ARCT-France, have been and are located in South Carolina. Part of the money collected by ARCT-France on sales of ARCT machines in Mexico is remitted by ARCT-France to DMRC in South Carolina in accordance with contracts between them made in South Carolina.

It is this basic plan and issues alleged to arise within its periphery that this court is called upon to survey and interpret.

---

14. An ARCT machine having 216 spindles or texturing stations is a very large machine not suitable for shipping in assembled condition. Typically the machines were forwarded from ARCT, Roanne, France, directly to a purchaser's plant, e. g., Duplan's plant at Dillon, South Carolina. Shipment would be made by ARCT-France via Air France or Pan Am of a number of boxes and barrels of machine parts to South Carolina. These various parts were then put together, assembled or manufactured into a complete machine by ARCT-France erectors in South Carolina.

(AND)
## CONCLUSIONS OF LAW

The jurisdiction of this court over the parties (Chavanoz and ARCT-France) is the sole issue. No other jurisdictional issues are in question at this writing.

■ A. This court, in deciding if it has personal jurisdiction over a foreign corporation, must first consider whether jurisdiction exists under the law of South Carolina and if that question is answered in the affirmative, whether the exercise of jurisdiction would violate due process.

■ B. The throwsters in these cases rely on South Carolina Code Annotated, Sections 10.2–802 and 10.2–803(a), (b), (c), (d), (g), and (h), the South Carolina long-arm statute, as the state law basis for the exercise by this court of jurisdiction over Chavanoz and ARCT-France. These statutes were intended to afford and do afford the courts of South Carolina the full reach of jurisdiction permitted by the due process clause of the United States Constitution. Shealy v. Challenger Manufacturing Company, 304 F.2d 102, 107 (4th Cir. 1962); Textured Fibres, Inc. v. Deering Milliken Research Corporation, supra. Thus the standard for testing the jurisdiction of this court over Chavanoz and ARCT-France is "due process."

C. For many years, the due process clause was interpreted as requiring a foreign corporation's "presence" within the foreign state before jurisdiction could be exercised. However, this rigid concept of jurisdiction was rejected by the United States Supreme Court in International Shoe Company v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The jurisdictional test formulated by the Supreme Court in that case provides that a court may assume jurisdiction over the person of a foreign corporation if that foreign corporation has certain "minimum contacts" with the forum state, such that the exercise of jurisdiction does not offend traditional notions of "fair play and substantial justice." The Court stated:

Historically the jurisdiction of courts to render judgment *in personam* is grounded on their de facto power over the defendant's person. Hence his presence within the territorial jurisdiction of a court was prerequisite to its rendition of a judgment personally binding him. Pennoyer v. Neff, 95 U.S. 714, 733, 24 L.Ed. 565. But now that the *capias ad respondendum* has given away to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

This being the governing principle as to the jurisdictional issue, it does not appear that requiring the two French corporations to litigate in this forum would violate the notions of fair play and substantial justice. The court in *International Shoe* further stated:

It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.

The fairness test of *International Shoe* was summarized in Szantay v. Beech Aircraft Corporation, 237 F.Supp. 393, 403–404 (E.D.S.C.1965):

It goes without saying that each case must be decided on its own particular facts, and that the courts have tended to discard the older concepts of jurisdiction, poignantly characterized in Pennoyer v. Neff, 95 U.S. 714, 24 L.Ed. 565, whereby jurisdiction was accorded on the premises of "implied consent" or on the basis that the corporation was "present" wherever its

activities are carried on; instead the test for jurisdiction is whether or not the subjection to suit would offend traditional notions of fair play and substantial justice. Boney v. Trans-State Dredging Co., 237 S.C. 54, 115 S.E.2d 508, 511, 512; Shealy v. Challenger Mfg. Co., 304 F.2d 102, 104 (4th Cir. 1962). Other considerations include a sensible application of the doctrine *forum non conveniens* and the corporation's "nexus" with the State.

Thus, in a very real sense, the recitation of facts and the discussion following, in which it was concluded that [the defendant] was "present" and "transacting business" in South Carolina, went a bit beyond what was necessary to be shown to hold [the defendant] amenable to suit in this State. Because, as was noted in the paragraph above, the doctrine enunciated has given away somewhat to an asking of whether or not the foreign corporation had such a "nexus" with the State that fair play and substantial justice would not be violated, taking into account the salutory doctrine of *forum non conveniens*, if the foreign corporation was held amenable to suit within the State.

In view of the substantial and continuous contacts of both Chavanoz and ARCT-France, as enumerated and described above, it is difficult to imagine how the assertion by this court of jurisdiction over these foreign corporations could in any way offend traditional notions of fair play and substantial justice.

### As to Chavanoz

D. Relying on Japan Gas Lighter Association v. Ronson Corp., 257 F.Supp. 219 (D.N.J.1966), Duplan listed a number of Chavanoz's contacts in this case which are substantially the same as those of the *Ronson* case where jurisdiction was held to be proper. The factors which were listed are:

(1) Chavanoz's exclusive agreements with DMRC whose headquarters are in South Carolina;

(2) Chavanoz's realization of royalty income from South Carolina;

(3) Chavanoz's retention of the patents;

(4) Chavanoz's continuing interest in the South Carolina operations and protection of the patents;

(5) Chavanoz's technical assistance to South Carolina;

(6) Chavanoz's inclusion in the agreements of improvements made or acquired by Chavanoz;

(7) Cooperation between Chavanoz and DMRC in pursuing infringers and sharing the cost thereof;

(8) The grant back to Chavanoz of the improvements made by DMRC;

(9) Chavanoz's requirements that books and records of operations under the agreement be kept and periodic reports made;

(10) Chavanoz's right to have the books and records inspected and verified.

Considering the above factors along with the negotiations, correspondence, and other communications, it is evident that the overall involvement of Chavanoz in South Carolina is sufficient to obtain jurisdiction. Viewing all these circumstances together and not as isolated events, it is clear the facts of this case do not offend due process.

E. Deering Milliken Research Corp. v. Textured Fibres, Inc., 310 F.Supp. 491 (D.C.1970) involved a suit between the patent licensee and a sublicensee. Although the present case concerns a cause of action by the sublicensee, Duplan, et al, against the licensee, Chavanoz, the discussion of contacts in the prior case is pertinent. In the *Textured Fibres* case, the court indicated the negotiation process is an important factor concerning jurisdiction.

There can be no question that negotiations taking place within a given State and looking toward the formation of a contract constitute a signifi-

cant contact with that State and are a significant factor to be considered in determining whether the nonresident individual or corporation is subject to the jurisdiction of the courts of that State. Thompson v. Ecological Science Corp., 295 F.Supp. 1307, 1311 (D.C.Ark.1969).

Some of the terms of the agreement in *Textured Fibres, Inc.* are similar to the case at hand in that there was an exchange of technical information and know-how; granting the usual any improvements acquired in the patents, payment of royalties, and the keeping of accurate records. The agreements were executed in North and South Carolina and in the present case execution was in France and South Carolina. The contract in question is at least to be partly performed in South Carolina. Chavanoz's obligation to give technical assistance, to include improvements acquired, and the right to have records inspected were no doubt to be performed in South Carolina. Chavanoz was also to share in the cost of litigation. It is presumed that these various provisions of the contract were real and not illusory. With the substantial amount of royalties received and the contacts Chavanoz has with South Carolina, the business cannot be characterized as casual or as constituting single or isolated acts.

F. In Throwing Corporation of America v. Deering Milliken Research Corporation, 302 F.Supp. 487 (M.D.N.C.1969), plaintiffs, licensees under the Chavanoz patents here in suit, sought a declaratory judgment as to the meaning of a certain provision in their license agreements with DMRC. DMRC moved to dismiss for lack of jurisdiction.

Judge Stanley denied the motion and held, *inter alia*, that DMRC was "transacting business" in North Carolina. DMRC's licensing arrangement with its North Carolina licensees was summarized as follows:

"DMRC has 23 licensees located in North Carolina, 9 of which are similar to the licenses in this action. In answer to interrogatories, DMRC states that it received royalties of more than $10,000.00 from 14 of its licensees in North Carolina during the year 1968. This is obviously a very substantial business. The licensees are required to maintain accurate and detailed records showing all information necessary to the computation of royalties, and DMRC has adopted a program of sending auditors into North Carolina for the purposes of examining the books and records of its licensees. One of such audits precipitated the present controversies. The licenses extend over a long period of years, and the large volume of business DMRC does in North Carolina can in no way be characterized as casual, or as constituting single or isolated acts."

Chavanoz's arrangement with DMRC in South Carolina is similar to and the umbrella for DMRC's sub-licenses with the North Carolina throwsters. Thus, *Throwing Corporation of America* is clear authority for holding that Chavanoz's licensing activities in South Carolina constitute doing or transacting business in South Carolina.

G. In addition, under Section 10.2–803 this court has jurisdiction over Chavanoz in these actions because the following subsections of that statute apply:

§ (a) Chavanoz is transacting business in this state. The statute says "any business."

§ (b) Chavanoz has contracted to supply services or things in South Carolina.

§ (c) Chavanoz has by reason of its misuse of the patents and violation of the American antitrust laws committed tortious acts at least in part in South Carolina.[15]

---

15. As alleged. Whether Chavanoz has committed the acts complained of will be determined at the hearing on the merits.

§ (d) Chavanoz has caused tortious injury by acts or omissions outside South Carolina while deriving substantial revenues from goods used or consumed or services rendered in South Carolina.[16]

§ (g) Chavanoz has entered into contracts to be performed at least in part in South Carolina by some parties to those contracts (for example DMRC).

In oral argument counsel conceded these South Carolina Statutes are constitutional. Their validity is not in issue.

The South Carolina Legislature in enacting these minimum contact statutes expressed the interest of South Carolina in this litigation and the intention of the state that such causes of action be litigated in South Carolina.

H. In short, Chavanoz cannot complain of being required to defend a lawsuit in South Carolina on these patents and the way it has chosen to work them here. Chavanoz apparently thought it could profit from such an arrangement, and it has in fact received very substantial sums therefrom. South Carolina has a continuing interest in this continuing relationship with South Carolina. Chavanoz has a continuing interest in profiting from the South Carolina market and, through its set-up with DMRC in South Carolina, from the American market. Chavanoz cannot complain if along with the profits it receives from South Carolina it must also accept the jurisdiction of the courts in South Carolina.

### ARCT-France

I. The same constitutional guidelines are, of course, applicable to ARCT-France. The court finds that the contacts are sufficient to require ARCT-France to litigate in this forum without violation of "fair play and substantial justice."

J. In May of 1963, ARCT-France contracted with DMRC which resulted in the rental of two F.T. machines to DMRC which were owned by ARCT-France. These machines are still being rented by DMRC. There is also an agreement between ARCT-France and DMRC to exchange development and "know-how" as it is acquired. In October 1967, ARCT-France also made an agreement with DMRC whereby DMRC would collect royalties on F.T. machines sold in Mexico and retain a portion of the royalties as its compensation. There were various other correspondence, visits, and communications between the parties; and employees from ARCT-France have come to South Carolina and elsewhere in the United States to assemble the F.T. machines and aid in servicing them.

K. In February 1966, ARCT-France established a subsidiary corporation known as ARCT, Inc., located in Greensboro, North Carolina, which has conducted business in South Carolina. ARCT, Inc. has the exclusive right to manufacture and sell F.T. machines in the United States and this is its sole business. ARCT-France provides supply parts and service components to ARCT, Inc. which is required to maintain a complete record of all parts and components in the consigned inventory and provide ARCT-France with a semi-annual inventory report. ARCT, Inc. is required to send ARCT-France each month a list of parts and components sold to customers during the month. There are also ARCT-France warranties on the F.T. machines which run to the purchasers. As in the agreement between Chavanoz and DMRC, these parties also have an agreement concerning the exchange of "know-how" and technical service. ARCT-France has to provide ARCT, Inc. with:

(a) use of its facilities and skilled personnel for research, development, and experimentation;

(b) use of any patent or patent rights owned by or in which ARCT-France has a transferable interest;

(c) skilled personnel employed by ARCT-France.

16. Ibid.

All inventions developed by ARCT, Inc. and patents are to be assigned to ARCT-France. There is also a provision whereby ARCT-France would reimburse ARCT, Inc. costs and expenses incurred in defending any litigation involving patents or trademarks made available to ARCT, Inc. by ARCT-France. ARCT, Inc. is a subsidiary of ARCT-France with some of the officers and directors occupying positions in both corporations. ARCT-France owns a majority of the stock of ARCT, Inc. A large amount of stock is owned by Robert Waters, Vice President of ARCT, Inc., but the alienability of the same is restricted pursuant to an agreement with ARCT-France.

L. In Aftanase v. Economy Baler Company, 343 F.2d 187 (8th Cir. 1965), Judge Blackmun, after reviewing the *International Shoe* decision and other Supreme Court decisions dealing with *in personam* jurisdiction, concluded:

"We * * * think it is fair to say that these * * * Supreme Court cases establish only general and not precise guidelines. Perhaps they purposely do no more than this. We observe, however, that, at one time or another in the opinions, three primary factors, namely, the quantity of the contacts, the nature and quality of the contacts, and the source and connection of the cause of action with those contacts, are stressed, and that two others, interest of the forum state and convenience, received mention." Id. at 197.

In accordance with Judge Blackmun's suggested analysis, ARCT-France's "contacts" with South Carolina will be examined with reference to the quantity of its contacts, the nature and quality of its contacts, and the connection of the throwsters' claims with those contacts. The interest of South Carolina, a major center of the yarn throwing industry in this country, in having the throwsters' claims fully and thoroughly adjudicated is clear, and it has previously been determined that South Carolina is the most convenient forum in which to adjudicate these claims.

M. ARCT-France's many and continuous direct contacts with South Carolina are set out above and include sales of machines intended to be used and used in South Carolina, the erection of such machines by its employees in South Carolina, the continuing ownership of machines in South Carolina, visits of its officers and employees to South Carolina on its business, receipt of rental fees from South Carolina, and enjoyment of immunity from suit by Leesona in South Carolina as a result of contracts it made in reference to machines of its manufacture being operated in South Carolina. These contacts have continued over many years and continue today.

N. The case of Southern Machine Company v. Mohasco Industries, Inc., 401 F.2d 374 (6th Cir. 1968), involved a declaratory judgment action arising out of a license agreement between Southern Machine, a Tennessee corporation, and Mohasco, a New York corporation whose only apparent contact with Tennessee (the forum state) was its entering into the license agreement with Southern Machine. In holding that Mohasco was subject to jurisdiction in Tennessee, the Sixth Circuit stated:

"We are applying a constitutional standard defined in the broadest terms of 'general fairness' to the defendant. * * * For the purposes of that standard, business is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant have a realistic impact on the commerce of that state; and the defendant has purposefully availed himself of the opportunity of acting there if he should have reasonably foreseen that the transaction would have consequences in that state." 401 F.2d at 382.

There can be little doubt in view of ARCT-France's extensive contacts with South Carolina that both of these requirements are satisfied in these cases. South Carolina is a major center of the yarn throwing industry in this country and texturing machines manufactured

by ARCT are used extensively in South Carolina. Thus, it cannot be doubted that the business operations set in motion by ARCT-France's contacts with South Carolina have had and continue to have a "realistic impact" on the economy of South Carolina. Nor can it be doubted that ARCT-France could reasonably foresee that those business operations would have such an impact. Each of the contacts enumerated above was calculated to have and did have an obvious effect in South Carolina and other yarn throwing centers.

O. The link between the throwsters' claims and ARCT-France's contacts with South Carolina is obvious. ARCT-France's contacts with South Carolina constitute an integral part of a plan or scheme by which ARCT-France, DMRC, Chavanoz, ARCT, Inc. and others have joined illegally to exploit the patents in suit at the expense of the throwsters, and ultimately the American public.[17] These suits challenge that whole plan and scheme—from the first ARCT-France contract and all the later ones, and its performance under them, down to the last benefit received today.

In summary, the quantity and the nature and quality of ARCT-France's contacts with South Carolina and the connection with those contacts with the throwsters' claims serve as a basis for the exercise by this court of jurisdiction over the person of ARCT-France.

P. ARCT-France caused ARCT, Inc. to be incorporated in 1966 under the laws of North Carolina. (See letter dated 26 August 1966 from Henri Crouzet, President of ARCT-France to Norman Armitage, Vice President of Deering Milliken Research Corporation attached hereto as Exhibit 52.) ARCT, Inc. is located in Greensboro, North Carolina, and is nothing more than a branch office or sales agent for ARCT-France. The contract between ARCT-France and ARCT, Inc., outlines the relationship between ARCT-France and ARCT, Inc.

This relationship may be summarized as follows:

(1) ARCT-France owns 60% of the stock of ARCT, Inc. Although 35% of the stock of ARCT, Inc. is owned by Robert F. Waters, Vice President of ARCT, Inc., this stock is subject to an agreement between Waters and ARCT, Inc. and ARCT-France which severely restricts the alienability of such stock with the result that ARCT-France, in effect controls this block of stock. (See contract between Robert F. Waters and ARCT, Inc. and ARCT-France).

(2) Leo Soep, a French citizen, who has acted as "attorney in fact" and trouble shooter for ARCT-France, is the owner of 5% of the stock of ARCT, Inc. and is a director of ARCT, Inc.

(3) Henri Crouzet, President of ARCT-France, is President and a director of ARCT, Inc. Charles Crouzet, Vice President of ARCT-France, is a director of ARCT, Inc.

(4) ARCT, Inc. is the sole distributor of and sole service agent for ARCT machinery in the United States.

(5) ARCT-France has licensed ARCT, Inc. under all of its patent rights.

(6) ARCT-France required ARCT, Inc. to "feed back" improvements in the machinery.

(7) ARCT-France has agreed to defend and save harmless ARCT, Inc. in patent litigation arising out of the sale of ARCT machines.

(8) ARCT-France pays for the warranty work performed by ARCT, Inc. in servicing said machines.

(9) ARCT, Inc. is held out by ARCT-France as its direct subsidiary and North American headquarters.

The above summary of the relationship between ARCT-France and ARCT, Inc. demonstrates that if indeed ARCT, Inc. enjoys any existence separate from ARCT-France, it is merely in form only, and that ARCT, Inc. is nothing more

17. Ibid.

than a completely dominated branch office or sales agent for ARCT-France. As such, ARCT-France can be served through service on ARCT, Inc.

Q. Hughes v. Kaiser Jeep Corporation, 246 F.Supp. 557 (E.D.S.C.1965), involved a wrongful death action brought in the United States District Court for the Eastern District of South Carolina against Kaiser Jeep Corporation, a Nevada corporation, and its sales subsidiary, Kaiser Jeep Sales Corporation, a Michigan corporation. The defendants' motions to dismiss for lack of jurisdiction were denied. The Court held that Kaiser Jeep Sales Corporation was subject to its jurisdiction by virtue of certain dealer contracts which it had entered into with its franchise dealers in South Carolina. The Court then asserted jurisdiction over the parent corporation on the following basis:

"It is true that defendant Kaiser Jeep Sales Corporation, and not defendant Kaiser Jeep Corporation, has entered into the direct dealer contracts with its dealers in this State. However, it is apparent that the former is a subsidiary sales organization of the latter which was created and is owned for the purpose of promoting the distribution and sales of the latter's manufactured Jeep products. Their relationship is so inter-related and entwined each with the other, as shown by their answers to the interrogatories, as to justify the court in finding that the acts of one are the acts of the other. Ideal Theater v. Southern Enterprises, Inc., 132 S.C. 352, 128 S.E. 166 (1924); Jones v. General Motors Corporation, 197 S.C. 129, 14 S.E.2d 628 (1941)."

ARCT, Inc. has conceded that it is subject to the jurisdiction of this court. The relationship between ARCT-France and its sales organization, ARCT, Inc. is so inter-related and entwined as to justify this court in finding that the acts of one are the acts of the other and, thus, that ARCT-France is likewise subject to the jurisdiction of this court.

R. In summary as to ARCT, whether you examine the contacts which are overall and direct or whether you view ARCT, Inc. as the agent and mere conduit in South Carolina on which service can be had, it is clear that ARCT-France is subject to the jurisdiction of the courts in South Carolina.

ARCT-France is doing business in South Carolina under Section 10.2–802. It is also subject to service under the following subsections of Section 10.2–803 in that it is

§ (a) Transacting business in South Carolina.

§ (b) Contracting to supply things in South Carolina.

§ (c) Committing tortious acts at least in part in South Carolina.[18]

§ (d) Causing tortious injury by acts or omissions outside South Carolina while soliciting business and deriving substantial revenue from goods used in South Carolina, [18]

§ (g) Has entered into contracts to be performed in whole or in part by either party in South Carolina.

§ (h) Has produced, manufactured, or distributed goods (i. e., the ARCT machines) with a reasonable expectation that those goods are to be used in South Carolina and those goods have been used in South Carolina. An essential part of this litigation is the question of tribute on the use of those machines in South Carolina.

## CONCLUSION

In view of the myriad contacts of both Chavanoz and ARCT-France with South Carolina and the overall challenge to their working of these patents in South Carolina raised by these suits, it is only fair that both Chavanoz and ARCT-France answer in this court and that

18. Ibid.

this court exercise its jurisdiction over them. The motions to dismiss should be denied and the cases permitted to proceed to trial on the merits.

And it is so ordered.